# UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT CASE NO. 24-13063-JJ

_____

## UNITED STATES OF AMERICA, APPELLEE,

### v.

## ANDREW A. FAHIE, APPELLANT.

_____

## ON DIRECT APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA. HON. KATHLEEN M. WILLIAMS, U.S. DISTRICT JUDGE

_____

## INITIAL BRIEF OF APPELLANT ANDREW A. FAHIE

_____

## THIS CASE IS ENTITLED TO PREFERENCE – CRIMINAL APPEAL

_____

BENEDICT P. KUEHNE
KUEHNE DAVIS LAW, P.A.
100 S.E. 2 ST., SUITE 3650
MIAMI, FL 33131-2154
TEL: 305.789.5989
FAX: 305.789.5987
EFILING@KUEHNELAW.COM
COUNSEL FOR APPELLANT

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

### CASE NO. 24-13063-JJ
### UNITED STATES V. ANDREW A. FAHIE

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Eleventh Circuit Rule 26.1-1, appellant certifies the following persons and entities may have an interest in this case:

Becerra, Jacqueline, U.S. District Judge

Butland, Shane

Charest-Turken, Gabrielle R.

Colan, Jonathan D.

Damian, Melissa, U.S. Magistrate Judge

Delgado, Joyce A.

Della Fera, Richard F.

Dopico, Hector A.

Fahie, Andrew A.

Federal Public Defender's Office

Galvez, Stephanie

Genovese Joblove & Battista, P.A.

Gerarde, Kevin

Gonzalez, Juan A.

Goodman, Jonathan, U.S. Magistrate Judge (Retired)

Houlihan III, Raymond D'Arsey

Kirkpatrick, Lynn

Kuehne, Benedict P.

Kuehne Davis Law, P.A.

Lapointe, Markenzy

Laux, Zakarij N.

Louis, Lauren F., U.S. Magistrate Judge

Matzkin, Daniel

Maynard, Kadeem S.

Maynard, Oleanvine P.

McAliley, Chris M., U.S. Magistrate Judge (Retired)

McLaughlin, Sean T.

Otazo-Reyes, Alicia M., U.S. Magistrate Judge (Retired)

Peralta, Lucrecia

Richard F. Della Fera, P.A.

Rodriguez, Jose R.

Shadley, Frederic

Van Vliet, Theresa M. B.

Venable LLP

Williams, Kathleen M., U.S. District Judge

To appellant's knowledge, no publicly traded company or corporation has an interest in the outcome of this case or appeal.

### STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument. The appeal presents significant issues of legal and factual complexity for which oral argument will assist with a comprehensive understanding of the case. The appellate decision-making process will benefit to a significant degree from oral argument, allowing the appellate panel to discuss with and question counsel concerning those aspects of the case that are of interest and concern.

TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ........................................................................ C1

STATEMENT REGARDING ORAL ARGUMENT.....................................................i

TABLE OF CONTENTS ...................................................................................ii

TABLE OF AUTHORITIES.............................................................................iv

STATEMENT OF JURISDICTION ....................................................................1

STATEMENT OF THE ISSUES ........................................................................1

STATEMENT OF THE CASE AND FACTS .......................................................2

      A.    COURSE OF PROCEEDINGS AND DISPOSITION BELOW.........2

      B.    FACTUAL BACKGROUND. ..................................................5

STANDARD OF REVIEW...............................................................................11

SUMMARY OF THE ARGUMENT ..................................................................13

ARGUMENT................................................................................................15

    POINT 1...........................................................................................15

    THE TRIAL COURT ERRED IN REFUSING TO DISMISS THE CHARGES BASED ON THE SIGNIFICANT GOVERNMENT MISCONDUCT BY WITHHOLDING INFORMATION THAT THE CONFIDENTIAL INFORMANT WAS FOUND BY A FOREIGN JUDICIAL OFFICER TO HAVE CREDIBILITY AND RELIABILITY ISSUES THAT RESULTED IN THE DISMISSAL OF CORRUPTION CHARGES AGAINST MEXICAN GOVERNMENT OFFICIALS...........15

    POINT 2...........................................................................................25

    THE EVIDENCE FAILED TO ESTABLISH THAT THE CONTROLLED SUBSTANCE THAT WAS THE OBJECT OF THE CONSPIRACY TO IMPORT COCAINE CONTAINED A DETECTABLE AMOUNT OF

COCAINE, THUS REQUIRING THE VACATION OF THE COUNT
I CONSPIRACY TO IMPORT COCAINE CONVICTION....................25

POINT 3................................................................................29

THE DISTRICT COURT ERRED IN FAILING TO GRANT A MISTRIAL
OR CONDUCT A COMPREHENSIVE INTERVIEW OF JURORS
WHO INDICATED THEIR DISAGREEMENT WITH THE
VERDICT. .............................................................................29

CONCLUSION ................................................................................37

CERTIFICATE OF COMPLIANCE ................................................38

CERTIFICATE OF SERVICE .........................................................39

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Chapman v. United States*,
  500 U.S. 453, 111 S. Ct. 1919 (1991) ....................................................26

*Illinois v. Gates*,
  462 U.S. 213 (1983) ........................................................................ 19, 20

*\*Ramos v. Louisiana*,
  590 U.S. 83, 140 S. Ct. 1390 (2020) .....................................................34

*Scott v. United States*,
  890 F.3d 1239 (11th Cir. 2018) ............................................................25

*United States v. $70,670.00 in U.S. Currency*,
  929 F.3d 1293 (11th Cir. 2019) ............................................................12

*United States v. Daniels*,
  803 F.3d 335 (7th Cir. 2015) ................................................................36

*United States v. Duldulao*,
  87 F.4th 1239 (11th Cir. 2023) .............................................................12

*United States v. Edwards*,
  469 F.2d 1362 (5th Cir. 1972) ..............................................................34

*United States v. Esformes*,
  60 F.4th 621 (11th Cir.) ................................................................. 11, 24

*United States v. Garcia*,
  447 F.3d 1327 (11th Cir. 2006) ............................................................27

*United States v. Haimowitz*,
  725 F.2d 1561 (11th Cir.) .....................................................................22

*United States v. Knowles,*
66 F.3d 1146 (11th Cir. 1995)..............................................................29

*United States v. McCoy,*
429 F.2d 739 (D.C. Cir. 1970) ............................................................34

*United States v. Mieres-Borges,*
919 F.2d 652 (11th Cir. 1990)..............................................................28

*United States v. Mulherin,*
710 F.2d 731 (11th Cir. 1983)..............................................................22

*United States v. Norwood,*
982 F.3d 1032 (7th Cir. 2020).......................................................12, 36

*United States v. Ofshe,*
817 F.2d 1508 (11th Cir.)....................................................................22

*United States v. Orisnord,*
483 F.3d 1169 (11th Cir. 2007).....................................................12, 34

*United States v. Pabian,*
704 F.2d 1533 (11th Cir. 1983)..............................................................18

*United States v. Robertson,*
493 F.3d 1322 (11th Cir. 2007)..............................................................12

*United States v. Russell,*
411 U.S. 423 (1973).......................................................................20, 22

*United States v. Schmitz,*
634 F.3d 1247 (11th Cir. 2011)..............................................................12

*United States v. Tobias,*
662 F.2d 381 (5th Cir. 1981)................................................................22

*United States v. Ward,*
197 F.3d 1076 (11th Cir. 1999)..............................................................27

## **Statutes**

18 U.S.C. § 924 ..............................................................................6
18 U.S.C. § 1952(a)(3)..............................................................1, 3
18 U.S.C. § 1956(a)(2)(A)........................................................1, 3
18 U.S.C. § 1956(h)...............................................................1, 2, 3
18 U.S.C. § 3231 .............................................................................1
18 U.S.C. § 3742 .............................................................................1
21 U.S.C. § 841(b)(1)(B).............................................................26
21 U.S.C. § 960(b)(1)...................................................................25
21 U.S.C. § 963 ......................................................................1, 2, 3
28 U.S.C. § 1291 .............................................................................1

## **Rules**

Federal Rules of Appellate Procedure
     Rule 4........................................................................................1
     Rule 26.1 .............................................................................. C1
     Rule 32(a)(7)(B) ...................................................................38

Federal Rules of Evidence
     Rule 606........................................................................................35

Eleventh Circuit Rules
     Rule 26.1-1..................................................................... C1

## STATEMENT OF JURISDICTION

The district court had jurisdiction of this case pursuant to 18 U.S.C. § 3231. Appellant-Defendant Andrew A. Fahie was charged by Superseding Indictment and convicted as charged in the four counts brought against him: Count 1: Conspiracy to import five kilograms or more of cocaine (21 U.S.C. § 963); Count 2: Conspiracy to engage in money laundering (18 U.S.C. § 1956(h)); Count 3: Attempted money laundering (18 U.S.C. § 1956(a)(2)(A)); and Count 4: Foreign travel in aid of racketeering (18 U.S.C. § 1952(a)(3)) (DE61; DE290). The court has jurisdiction over this direct appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, giving courts of appeals jurisdiction over all final decisions and sentences of United States district courts, and Rule 4 of the Federal Rules of Appellate Procedure. The judgment sentencing Fahie to a cumulative term of imprisonment of 135 months imprisonment followed by supervised release for five (5) years and a special assessment of $400.00 (DE290) resolved the case in the district court. The Notice of Appeal (DE296) was filed timely.

## STATEMENT OF THE ISSUES

1.    Did the trial court err in refusing to dismiss the charges based

1

on the significant government misconduct by withholding information that a foreign judicial officer found the confidential informant to have credibility and reliability issues that resulted in the dismissal of corruption charges against Mexican government officials?

2.    Was the evidence insufficient to establish that the controlled substance that was the object of the conspiracy to import cocaine contained a detectable amount of cocaine, thus requiring the vacation of the Count I conspiracy to import cocaine conviction.

3.    Did the district court err in failing to grant a mistrial or conduct a comprehensive interview of jurors who indicated their disagreement with the verdict?

## STATEMENT OF THE CASE AND FACTS

### A.    COURSE OF PROCEEDINGS AND DISPOSITION BELOW.

Andrew A. Fahie (pronounced "Foy") (DE322:3) was charged by criminal complaint together with codefendants Oleanvine Pickering Maynard ("Oleanvine") and Kadeem Stephan Maynard ("Kadeem") on April 28, 2022, alleging that from October 16, 2021, through April 28, 2022, the defendants conspired to import cocaine and launder money in violation of 21 U.S.C. § 963 and 18 U.S.C. § 1956(h) (DE1). Fahie was the Premier of the British Virgin Islands at the time of his April 28, 2022

arrest at the Opa-Locka Airport (DE1:5; DE333:6).

The defendant was released on pretrial bond (DE33; DE38; DE42; DE43), while his codefendants were pretrial detained (DE26; DE50).

The Grand Jury returned an Indictment on May 10, 2022 (DE21), and a Superseding Indictment on November 8, 2022 (DE61), charging defendant Fahie in four of five counts: Count 1: Conspiracy to import five kilograms or more of cocaine (21 U.S.C. § 963); Count 2: Conspiracy to engage in money laundering (18 U.S.C. § 1956(h)); Count 3: Attempted money laundering (18 U.S.C. § 1956(a)(2)(A)); and Count 4: Foreign travel in aid of racketeering (18 U.S.C. § 1952(a)(3)). The conduct arose out of a government sting operation (DE345:12).

The codefendants pled guilty to Count 1 Conspiracy to import cocaine (DE100-104) and received sentences of 57 months imprisonment for Kadeem (DE139) and 112 months imprisonment for Oleanvine (DE281), followed by supervised release for five (5) years. Oleanvine testified at Fahie's trial (DE337:27). Both Oleanvine and Kadeem obtained sentence reductions based on their cooperation (Sealed DE309; Sealed DE327).

During pretrial proceedings and renewed at trial, Defendant Fahie

sought dismissal due to the government's pattern of misconduct in failing to disclose that its confidential informant had been found to lack credibility by a judicial officer in Mexico, resulting in the dismissal of narcotics-related corruption charges brought against Mexican government officials (Sealed DE137; Sealed DE203). United States Government officials were aware of the judicial findings lodged against the CI but declined to disclose that finding in Defendant Fahie's court proceedings, including when the case agent denied knowing of adverse credibility findings against the CI during Defendant Fahie's bond hearing (DE322:23-24) and again at trial (DE335:83-87). The district court denied the requested relief (DE338:101-107).

Defendant Fahie proceeded to trial (DE215; DE216; DE217; DE219; DE220; DE221; DE223; DE224; DE225) and was convicted by the jury as charged on the eighth trial day, February 8, 2024 (DE225, 254). He was remanded to custody after the jury verdict (DE225) and has remained in continuous federal custody.

Immediately following the jury verdict, the district court received information from the Courtroom Deputy that two jurors (Sabrina Garcia and Jancarlo Bowen) voiced dissatisfaction with the verdicts after their

discharge, insisting they would have found Defendant Fahie not guilty (DE339:132-133). As a result, the district court received briefing concerning the validity of the jury's verdict (DE227; DE228; DE230; DE231; DE233; DE245; DE251) and conducted an in-person inquiry with Juror 11 (Garcia) on March 7, 2024 (DE252; DE351:15-16). Juror Garcia responded to the district court's inquiry whether the verdict as rendered was her verdict (DE351:16):

> THE COURT: I am going to ask you again, Ms. Garcia, at the time -- well, let me ask you again, the verdict that was rendered on February 8th, was that your verdict?

> MS. GARCIA: Yes. At the time that I answered that.

The district court scheduled sentencing for Defendant Fahie (DE273), imposing a cumulative term of imprisonment of 135 months, followed by supervised release for five (5) years (DE288; DE290). Fahie timely filed his Notice of Appeal (DE296).

### B.    FACTUAL BACKGROUND.

The government sting began with a confidential informant ("CI") (using the pseudonym Roberto Quintero) (DE333:12; DE335:10, 70; DE338:58) who met with both codefendants Oleanvine Pickering Maynard ("Oleanvine") and her son, Kadeem Stephan Maynard ("Kadeem") on March 20, 2022 (DE337:42). Oleanvine was the Managing

5

Director of the BVI Ports Authority (DE227:29-32).

Purporting to be a member of the Sinaloa Cartel interested in using the British Virgin Islands ("BVI") as a transshipment point for the passage of cocaine from Colombia to Puerto Rico (DE334:3; DE335:15-17), the CI first met with Kadeem in Tortola, BVI to discuss the transshipment of cocaine through BVI waters.[1] Kadeem agreed to make an introduction to Oleanvine to discuss the proposal (DE337:40-41, DE338:50). On March 20, 2022, Kadeem arranged a meeting with the CI and Oleanvine in St. Thomas, U.S. Virgin Islands (USVI) (DE337:41-42, DE338:50), during which the CI informed Oleanvine and Kadeem of his ties to the Sinaloa Cartel, requesting their assistance in allowing cocaine from Colombia to temporarily pass through BVI en route to Puerto Rico, with the ultimate destination intended to be Miami, Florida (DE337:53). The CI wanted protection and safe passage for the shipment in BVI waters for no more than 48 to 72 hours, until it could be taken to Puerto Rico (DE338:73-74). Throughout his conversations, the CI repeatedly assured the participants that the substance he described as cocaine

---

[1] The undercover meetings with Defendant Fahie and the codefendants were recorded and introduced into evidence at trial (DE333:13-18; Govt. Exs 11, 12, 13, 26).

would appear to be construction materials in liquid form that would "never test positive, never, never, never" for cocaine during any inspections (DE335:15; DE337:43-44; DE338:51-53, 71-73). From the very first meeting, the CI explained that the substance was in the form of liquid concrete construction materials that had been subjected to a chemical process so it could not test positive for cocaine until it was chemically extracted into cocaine through a process that took four days to complete (DE338: 51-53, 71-74). The extraction process would not occur until the liquid was in Puerto Rico (DE338:52-53, 72-75). The CI repeatedly emphasized that the chemical process of extracting the construction materials into cocaine would occur in Puerto Rico (DE53). Oleanvine agreed to assist the CI with obtaining the necessary licenses and paperwork, including the use of shell companies to conceal payments (DE338:552-53).

The CI proposed a test run of 3,000 kilograms of the construction materials to be transshipped through BVI, after which they would plan additional shipments over the next four months (DE333:46; DE334:19; DE337:99; DE338:50-51). Oleanvine acknowledged she would need to involve BVI government officials, including Defendant Fahie, BVI's

elected Premier (DE335:41; DE337:28-29). At the end of the March 16 meeting, the CI gave Oleanvine and Kadeem a gift of $10,000.00 in cash as a gesture of good faith (DE337:51-52).

On March 22, 2022, claiming to have spoken with Defendant Fahie, Oleanvine informed the CI that an up-front payment of $500,000.00 was required for Defendant Fahie's involvement (DE337:61-62). Oleanvine confirmed she had started the business licensing process to further the scheme (DE337:48, 68). Kadeem would serve as the shipping agent for the operation (DE337:69). Separately, Oleanvine and Kadeem discussed their own cocaine distribution plan with the CI that would not involve Defendant Fahie (DE338:46).

On April 7, 2022, the CI met in person with Oleanvine and Defendant Fahie in BVI, during which Defendant Fahie purported to agree with the proposed transshipment scheme in exchange for 12% of the proceeds from the cocaine sales in the United States, of which 2% would be used to facilitate payments to BVI officials (DE337:83-96). Unbeknownst to the government operative, Defendant Fahie secretly photographed the CI at this meeting (DE338:70; Defense Exs. 1-2). The CI estimated the cocaine would sell for $26,000.00 to $28,000.00 per

kilogram in Miami and at a higher price per kilogram in New York (DE333:38). Defendant Fahie calculated that his payment would be $7.8 million (DE338:74-75).

The CI agreed to meet Defendant Fahie and Oleanvine at a Sea Trade Convention in Miami to deliver required payments (DE337:65-66), after which the Defendant and Oleanvine would return to BVI (DE338:30-31). The CI gave Defendant Fahie $20,000.00 in cash as a good faith gift (DE337:103). Defendant Fahie suggested that the BVI officials who needed to be paid were already involved in drug trafficking with others (DE335:19, DE337:59-60, 62).

On April 24, 2022, Defendant Fahie traveled to the United States to attend the Sea Trade Convention in Miami (DE338:65-66).

On April 27, 2022, the CI, together with undercover Detective Jossue Dominguez (using the name Jose) (DE333:3; DE338:32), met with Oleanvine to discuss her separate "side deal" cocaine transaction of which Defendant Fahie was unaware and uninvolved (DE333:24-25; DE335:13-14). Undercover Detective Dominguez portrayed himself as a member of the Sinaloa Cartel (DE333:6, 11). When the conversation turned to the transshipment scheme, Oleanvine and the CI confirmed the ship would

remain in BVI waters and not enter the port (DE338:57).

That same evening, April 27, 2022 (DE338:32), the CI and Det. Dominguez met with Defendant Fahie at the Embassy Suites Hotel in Miami (DE338:35). They discussed whether the BVI Commission of Inquiry investigating corruption on the island would cause problems for the planned operation (DE338:65, 89), to which Defendant Fahie responded that it would not have any impact, and he would take care of the government officials (DE338:89-90). Defendant Fahie intended to leave Miami the next day to travel to Philadelphia (DE334:22, 30), to which the CI responded that he could arrange a flight on his private aircraft (DE334:18-19). The CI and the Undercover Detective made plans to take Defendant Fahie to the Opa-Locka Airport the next morning, April 28 (DE334:32).

As agreed, the CI and the Undercover Detective picked up Defendant Fahie at his Florida residence and drove with him to the Opa-Locka Airport the morning of April 28, 2022 (DE334:32-33, 37). Upon their arrival, the CI took Defendant Fahie into the airplane to show him bags containing $700,000.00 intended as payment for the transshipment scheme (DE335:4, 43). The Defendant was immediately arrested after

exiting the plane (DE335:5).

Later that April 28 morning, the CI and Undercover Detective Dominguez picked up Oleanvine and Defendant Fahie's friend and assistant Roxanne Sylvester (DE335:23-24) from a hotel in Miami to drive to the Opa-Locka Airport (DE335:6-7). Upon arriving, they entered the same private jet and were shown the $700,000.00 in cash, with the CI explaining $200,000.00 was for Oleanvine and the remaining $500,000.00 was for Defendant Fahie (DE338:75). Oleanvine was then arrested (DE338:83-85). Roxanne, who was only detained but not arrested or charged (DE335:69; DE338:84-85), revealed that the Defendant intended to have the CI arrested and investigated in the BVI for his planned scheme (DE338:85-86). Oleanvine was aware that Defendant Fahie believed the British government, the controlling authority in BVI, was at odds with him through its Commission on Inquiry (DE338:65-66).

## STANDARD OF REVIEW

1.    Decisions not to dismiss an indictment are reviewed for abuse of discretion. *United States v. Esformes*, 60 F.4th 621, 631 (11th Cir.), *cert. denied*, 144 S. Ct. 485 (2023). "A district court abuses its discretion

11

when it applies an incorrect legal standard, relies on clearly erroneous factual findings, or commits a clear error of judgment." *United States v. $70,670.00 in U.S. Currency*, 929 F.3d 1293, 1300 (11th Cir. 2019).

2.    An appellate court reviews the sufficiency of the evidence *de novo*, considering the evidence "in the light most favorable to the government" and "resolv[ing] all reasonable inferences and credibility evaluations in favor of the jury's verdict." *United States v. Schmitz*, 634 F.3d 1247, 1259 (11th Cir. 2011); *United States v. Duldulao*, 87 F.4th 1239, 1251 (11th Cir. 2023) ("We review the sufficiency of the evidence de novo when, as here, the defendant[s] have preserved [their] claim[s] by moving for ... judgment[s] of acquittal."). "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *United States v. Robertson*, 493 F.3d 1322, 1329 (11th Cir. 2007).

3.    A district court's decision concerning post-verdict jury interviews and the lack of a unanimous verdict is reviewed for abuse of discretion. *United States v. Orisnord*, 483 F.3d 1169, 1179 (11th Cir. 2007); *United States v. Norwood*, 982 F.3d 1032, 1056 (7th Cir. 2020)

("We review a district court's handling of allegations of juror bias or misconduct for abuse of discretion.").

<h2 align="center">SUMMARY OF THE ARGUMENT</h2>

1.    The government repeatedly withheld material information that the CI had been found to lack reliability by a Mexican judicial officer in a Mexican public corruption investigation, resulting in the dismissal of charges against a Mexican official targeted by the CI. The United States was aware of this information about its CI from its inception, yet withheld the information from the court when submitting an affidavit based on information from the CI, swore under oath in court proceedings that the CI was reliable, and falsely claimed the case agent in the Defendant's case was unaware of the CI's adverse credibility finding. This egregious misconduct was brought to the attention of the district judge, who refused to dismiss the charges based on government misconduct. Additionally, the case agent testified to the CI's positive credibility and reliability, unfairly buttressing the case made by the CI and undermining the Defendant's defense that he was wrongly targeted by in the government sting operation.

2.    Despite being charged with a cocaine importation conspiracy,

the government's evidence revealed that the CI repeatedly and continuously claimed the substance purporting to be cocaine was actually liquid construction materials that had been chemically processed so it would never test positive as cocaine, and the cocaine could only be extracted through a 4-day chemical process in Puerto Rico. Thus, according to the CI, the transshipment through BVI waters would never test positive for cocaine. Since the cocaine never existed in the government's sting operation, the CI's assurances that the substance could never be detected as cocaine did not prove the presence of a conspiracy to import a detectable amount of cocaine from BVI into Puerto Rico and the United States. This failure of proof requires the vacation of the cocaine importation conspiracy conviction and the Defendant's discharge.

3.    Immediately after the jury was excused after delivering its verdict, two jurors informed a court officer that the verdict was not theirs. One of the jurors had even appeared to disagree with the verdict while in court. The district court's handling of the post-verdict disclosures contesting juror unanimity failed to protect the Defendant's constitutional right to a unanimous jury verdict. Although the district

court conducted an evidentiary hearing on the disclosure and questioned one of the two dissenting jurors, the court's inquiry failed to provide an assurance of juror unanimity and did not include questioning the second dissenting juror. This truncated process was insufficient to validate the verdict, with the result that a mistrial should be ordered or the case remanded to the district court with instructions to conduct a thorough evidentiary hearing on jury unanimity.

ARGUMENT

POINT 1

THE TRIAL COURT ERRED IN REFUSING TO DISMISS THE CHARGES BASED ON THE SIGNIFICANT GOVERNMENT MISCONDUCT BY WITHHOLDING INFORMATION THAT THE CONFIDENTIAL INFORMANT WAS FOUND BY A FOREIGN JUDICIAL OFFICER TO HAVE CREDIBILITY AND RELIABILITY ISSUES THAT RESULTED IN THE DISMISSAL OF CORRUPTION CHARGES AGAINST MEXICAN GOVERNMENT OFFICIALS.

The government's sting was dependent on the actions, conversations, and recordings of the CI, an operative whose truthfulness and reliability were undermined by the 2018 ruling of a judge in Mexico who dismissed drug corruption charges against a high-ranking Mexican government official because the same confidential informant "lacked integrity" in connection with his investigative actions and testimony

15

(Sealed DE137:2 ¶¶2, 11).[2] While the CI did not testify, the adverse judicial finding was withheld and not disclosed to the district court until defense counsel challenged the government's repeated failings (DE338:101-105). Still, the testifying case agent who was aware of the Confidential Informant's misconduct and adverse ruling by foreign tribunal misled the district court during bond proceedings before the U.S. Magistrate Judge (DE322:23-24), and did so again during trial when he denied knowing about the adverse judicial finding at the time of his earlier testimony (DE335:83-86).

The consequential impact of the confidential informant's perfidy and the government's withholding was extensively litigated during pretrial discovery proceedings (Sealed DE76; Sealed DE82; Sealed DE83; Sealed DE96; Sealed DE131; Sealed DE134), by a pretrial motion to dismiss (Sealed DE137l Sealed DE143; Sealed DE146; Sealed DE207), and unsuccessfully renewed again during trial (DE338:101-107). Yet, by reason of the testifying case agent's repeated failure to disclose this information to the district court, his misleading statement to the jury

_____

[2] The informant's recordings were not simultaneously monitored by law enforcement (Sealed DE137:7).

that he was unaware of the foreign judge's adverse credibility finding prior to his denial of any reliability issues during his May 2022 testimony (DE335:85), and minimizing the Confidential Informant's questionable credibility before the jury by stating "we never had any issues with him[]" (DE335:84), the government unfairly misled both the court and the jury, and thereby prevented the jury from considering the Confidential Informant's dishonesty in evaluating the interactions with Defendant Fahie in the government's sting operation.

The district court, while denying the dismissal motion (DE338:107), nonetheless expressed significant concern with the case agent's lack of candor in this case in his apparent attempt to buttress the informant's conduct (DE338:106-107):

> THE COURT: I don't know what the answer is either quite frankly.
>
> I will reiterate what I've said before as to the motion to dismiss with regard to the failure to include information on the affidavit; I could find no case law that required the Government to list within an affidavit every issue there may have been with their CI or cooperating witness.
>
> Ultimately, while I don't think Agent Witek comported himself the way one expects a Federal law enforcement agent should in front of a jury, after I intervened on pages 20 and 21 he ultimately acknowledged that he knew of the general information about the CI's credibility.

17

But, again, that was only after I intervened because I was concerned about his demeanor and his conduct in front of this jury. But in any event, he finally acknowledged it.

And as you noted, yourself, Mr. Gerarde got up and impeached or corrected his own witness.

So, Ms. Van Vliet, I do not believe that there is a sufficient basis for which to grant you renewed motion.

I have been assured by these prosecutors that the Department is reviewing this matter and that it will be addressed in whatever way, I guess, is deemed appropriate.

Again, I do not believe it rises to the level of – or where the Court would dismiss the indictment. I don't believe the case law would support that.

"Federal courts possess the power and duty to dismiss federal indictments obtained in violation of the Constitution or laws of the United States." *United States v. Pabian*, 704 F.2d 1533, 1536 (11th Cir. 1983). The core concern in this case that warrants a dismissal for egregious misconduct is the government agent's attempt to mask the Confidential Informant's misconduct when targeting a different high ranking government official that led to a dismissal of the foreign prosecution. The impact of that misconduct on the credibility of the Informant's recorded conversations and interactions with Defendant Fahie, also a highly ranked government official cannot be understated, particularly when the Informant's description of the scheme emphasized

that the "construction materials" could not and never would test positive for cocaine until it was chemically altered in Puerto Rico after a four-day processing (DE338:53, 71-74). Thus, despite the informant not offering testimony at trial, his words presented to the jury through the recordings effectively required the jury to evaluate his credibility.

The case agent's conduct here in masking the adverse credibility finding is not so different from the concern expressed by the Supreme Court in *Illinois v. Gates*, 462 U.S. 213, 230 (1983):

> We agree with the Illinois Supreme Court that an informant's "veracity," "reliability," and "basis of knowledge" are all highly relevant in determining the value of his report. We do not agree, however, that these elements should be understood as entirely separate and independent requirements to be rigidly exacted in every case, which the opinion of the Supreme Court of Illinois would imply. Rather, as detailed below, they should be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is "probable cause" to believe that contraband or evidence is located in a particular place.

But unlike the probable cause finding in *Gates*, this undisclosed and materially misleading information presented at trial prevented the jury from engaging in the "commonsense, practical" question of whether the informant's insistence that the substance was not detectable as cocaine (DE335:15; DE337:43-44) actually led Defendant Fahie to understand

19

that the transshipment scheme did not involve any cocaine at all.

The conduct at trial here implicates the concern acknowledged by the Supreme Court in *United States v. Russell*, 411 U.S. 423, 431-432 (1973), that certain government conduct can undermine due process protections: "While we may someday be presented with a situation in which the conduct of law enforcement agents is so outrageous that the due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction ... the instant case is distinctly not of that breed." This situation is precisely of that breed, warranting the dismissal of the case against Defendant Fahie.

The circumstances presented to the district court here demonstrate that the case agent flatly misled the U.S. Magistrate Judge at the May 4, 2022 pretrial detention hearing (DE322:23-24) when he testified the "confidential source is reliable, trustworthy." The case agent then denied being aware that the informant's credibility had been questioned (DE322:24). But this testimony was false, as made clear in the government's extensive record of the judicial finding that the informant

20

was unreliable (Sealed DE203).[3] That finding by a judge in Mexico led to the dismissal of the Mexican anti-corruption case against high level Mexican government officials, in which the same informant was the lead undercover operative.

The government's revealing and alarming confirmation came about only because Fahie's defense counsel pressed the issue and the district court ordered a hearing on the circumstances of the credibility finding against the informant (DE346). The government's detailed explanation underscored the Mexican judicial officer's finding that the Informant engaged in conduct and false statements that "constituted an act of fabricating evidence." (Sealed DE203:2). The case agent, despite denying any such knowledge of the Informant's questionable credibility before his May 4, 2022 sworn testimony, had personally spoken with the Informant about his alleged perjury (Sealed DE203:4). Yet, at trial, the same agent who had personal knowledge of the perjury allegations against the informant contended under oath at trial that he had only acquired that information "[j]ust before getting ready for this trial." (DE335:86).

---

[3] Defense counsel's sealed factual submission was equally revealing of the informant's lack of candor (Sealed DE96).

This Court discussed the scope of an outrageous government misconduct dismissal in *United States v. Ofshe*, 817 F.2d 1508, 1516-1517 (11th Cir.), *cert. denied*, 484 U.S. 963 (1987), a decision in which this Court declined to dismiss an indictment for the government's invasion of the defendant's attorney-client privilege and right to counsel. This Court did, however, offer guidance for this case when commenting on the contours of a government misconduct dismissal:

> To constitute a constitutional violation the law enforcement technique must be so outrageous that it is fundamentally unfair and "shocking to the universal sense of justice mandated by the Due Process Clause of the Fifth Amendment." *Russell*, at 432, 93 S. Ct. at 1643. In determining whether such conduct exists, the "totality of the circumstances" must be considered "with no single factor controlling." The defense is to be invoked only "in the rarest and most outrageous of circumstances." *United States v. Haimowitz*, 725 F.2d 1561, 1577 (11th Cir.), *cert. denied*, 469 U.S. 1072, 105 S. Ct. 563 (1984), quoting *United States v. Tobias*, 662 F.2d 381, 387 (5th Cir. 1981), *cert. denied*, 457 U.S. 1108, 102 S. Ct. 2908 (1982). *See also United States v. Mulherin*, 710 F.2d 731, 735 (11th Cir. 1983), *cert. denied*, 464 U.S. 964, 104 S. Ct. 402 (1984). Moreover, in *Hampton*, the court indicated that ... a demonstrable level of outrageousness warranting dismissal would be especially difficult to show in contraband offenses "which are so difficult to detect in the absence of undercover government involvement." *Hampton*, at 495 n. 7, 96 S. Ct. at 1653 n. 7.

Here, the pervasive and ongoing government efforts to conceal the informant's past misconduct did not stand alone. The government

22

additionally presented its case with the case agent's misleading testimony that masked the informant's misconduct in an undercover scheme targeting government officials in Mexico. The combination of this misconduct imperiled Defendant Fahie's right to have the jury understand the willingness of the government in this undercover sting to allow an informant with questionable credibility to convince the Defendant to become involved in a drug transshipment in which the described cocaine could not and would ever be detected as cocaine until it was chemically processed after departing BVI waters. Especially the case agent's testimonial insistence that the informant was credible and he was unaware, during the operation of this case, of the Informant's questionable veracity in an earlier undercover public corruption investigation (DE335:84, 87-88), undercuts the jury's evaluation of the Defendant's intention to cause an investigation of the Informant's conduct. (DE338:85-86). By doing so, the government misconduct prevented the jury from fairly considering the theory of defense.[4]

_____

[4] The district court instructed the jury on the defense theory (DE253:28): "The defense contends that the Defendant, during the dates alleged in the superseding indictment, had an honestly held belief that

The government cited to the district court this Court's decision in *United States v. Esformes*, 60 F.4th 621, 633 (11th Cir.), *cert. denied*, 144 S. Ct. 485 (2023) (Sealed DE143:7), for the proposition that even egregious government misconduct does not warrant dismissal absent a showing of prejudice. The *Esformes* misconduct arising from the government's access to privileged materials caused no prejudice because "the privileged materials did not serve as either the basis for the charges against him or the evidence admitted at trial." *Id*. Yet, the informant's conduct and statements are the very essence of the Defendant's prosecution, such that the jury was entitled to know the informant's unreliability when facilitating an undercover investigation targeting government officials in which the informant repeatedly insisted to the Defendant that the "construction materials" would never test positive for cocaine (DE335:15; DE338:51-53).

The protracted withholdings here "reward[] the government for its unfair prosecution and condemns the [defendant] for a crime that the jury

_____

others were attempting to remove him from his position in the British Virgin Islands government. You may consider whether the Defendant honestly held such a belief in determining whether the Defendant had the requisite intent to commit each of Counts I-IV beyond a reasonable doubt."

in a fair trial may well have acquitted hm of. This not only corrodes faith in our system of justice, but it undermines justice itself, and it cannot be allowed." *Scott v. United States*, 890 F.3d 1239, 1243-1244 (11th Cir. 2018) (in denying successive motion to vacate, the court noted that "No conviction resulting from a fundamentally unfair trial should be permitted to stand."). While the district court was willing to allow the government to address the misconduct in some other way (DE338:106-107), the appropriate remedy is dismissal for government misconduct. The district court's failure to do so constitutes an abuse of discretion.

### POINT 2
**THE EVIDENCE FAILED TO ESTABLISH THAT THE CONTROLLED SUBSTANCE THAT WAS THE OBJECT OF THE CONSPIRACY TO IMPORT COCAINE CONTAINED A DETECTABLE AMOUNT OF COCAINE, THUS REQUIRING THE VACATION OF THE COUNT I CONSPIRACY TO IMPORT COCAINE CONVICTION.**

Count I charged the Defendant with conspiring to import "five kilograms or more of a mixture and substance containing a detectable amount of cocaine," as required by 21 U.S.C. § 960(b)(1)(B)(ii) (DE61). But the government's proof was decidedly to the contrary, that the "liquid construction materials" prepared for transshipment into BVI waters would "never, never, never" test positive for cocaine because the

25

substance had been subjected to a chemical process that would only test positive once it was extracted after a four-day processing when the shipment arrived in Puerto Rico (DE338:71-73). The CI's insistence and assurance that the substance was not recognizable or detectable as cocaine undercuts the government's required element of proof that the substance contains "a detectable amount of" cocaine.

The government's evidence that the purported substance could not test positive for cocaine until it was chemically extracted in Puerto Rico defeats the statutory requirement that the mixture or substance contain a detectable amount of contraband. The government contention that a detectable quantity is unnecessary in an importation conspiracy sting is inconsistent with the statutory language, a point made plain by the Supreme Court in *Chapman v. United States*, 500 U.S. 453, 468, 111 S. Ct. 1919, 1929 (1991), holding that the drug distribution statute (21 U.S.C. § 841(b)(1)(B)) requiring a detectable amount of contraband to be construed to include the entire mixture when determining its weight.

Applying the *Chapman* principle to this case makes abundant sense and is consistent with the constitutional requirement of proof beyond a reasonable doubt. A substance, whether described as construction

materials or cocaine, which cannot be detectable as cocaine is either not, in fact cocaine, or is a chemical derivative that is not yet cocaine. This legal quandary is precisely what was intended by the government in designing and pursuing its sting operation: purporting to transship a substance that could not be cocaine until it was chemically extracted through a scientifically complicated four-day process. That was the sting operation as explained to the Defendant and his coconspirators, and that does not constitute an importation conspiracy when no cocaine was to be transshipped from BVI to Puerto Rico until it was remanufactured as cocaine in Puerto Rico.

The defendant sought a judgment of acquittal at trial based on the government's failure to prove a detectable amount of cocaine in the construction materials transshipped through BVI. While trial evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion but guilt, *United States v. Garcia*, 447 F.3d 1327, 1334 (11th Cir. 2006), the jury must nonetheless be presented with sufficient evidence to find the defendant guilty beyond a reasonable doubt. *United States v. Ward*, 197 F.3d 1076, 1079 (11th Cir. 1999).

Here, the government did not meet that burden by creating a sting

27

in which the defendant is repeatedly informed that, despite calling construction materials cocaine, they did not constitute cocaine until they were chemically processed into cocaine in Puerto Rico. Apart from referring to non-cocaine as cocaine, the CI repeatedly explained that the substance could not be detected as cocaine until a four-day chemical processing had occurred. That processing would not take place in BVI, and the substance being transshipped was not cocaine until the chemical alteration occurred. This absence of culpable conduct of contraband importation, even when viewed in the government's most favorable light, does not supply a reasonable fact finder with sufficient evidence to find guilt beyond a reasonable doubt. *See United States v. Mieres-Borges*, 919 F.2d 652, 656 (11th Cir. 1990) (reversing drug conviction for mere presence when evidence did not involvement in drug conspiracy or possession with intent to distribute). The government offered no testimony from the CI or his handlers that construction materials that would not test positive for cocaine until chemically altered were in fact detectable cocaine. Failing that proof, the jury was left to speculate on how non-cocaine could be cocaine while transiting through BVI. Such speculation, devoid of any reasonable inference, cannot support the proof

needed for a criminal conviction. *United States v. Knowles*, 66 F.3d 1146, 1154 (11th Cir. 1995) (standard of review applies in assessing the sufficiency of "any criminal conviction, including one for conspiracy.").

The government's failure to meet its stringent burden of proving Defendant Fahie's involvement in a cocaine importation conspiracy involving a substance identified as not testing positive for cocaine until it was chemically processed requires a vacation of his importation conspiracy conviction.

<u>POINT 3</u>

**THE DISTRICT COURT ERRED IN FAILING TO GRANT A MISTRIAL OR CONDUCT A COMPREHENSIVE INTERVIEW OF JURORS WHO INDICATED THEIR DISAGREEMENT WITH THE VERDICT.**

Almost immediately after the jury returned its verdict, a question arose concerning the possible lack of juror unanimity, resulting in the district court directing the parties to file briefs and eventually convening a hearing to conduct a brief interview of one juror who had expressed reservations about the verdict. The district court did not interview the second juror who had raised concerns about the verdict and declined to order a mistrial. Because of the significance of the jurors' remarks questioning the verdict, the district court abused its discretion by failing

29

to grant a mistrial or conduct a full evidentiary inquiry involving the dissenting jurors to determine the validity of the verdict.[5]

The circumstances of the jurors' reservations were summarized by the district court at the start of the evidentiary hearing on March 7, 2024, and acknowledged by counsel as accurate (DE351:2-4):

> THE COURT: Good morning. Good morning, Mr. Fahie. All right. We're here today for a final hearing on our, for lack of a better characterization, our 606 juror issue. Parties have briefed the matter and I have heard argument. So I think it's appropriate to recap what got us here, which I believe there are no disputes -- there is no dispute.
>
> As to the facts on Thursday, February 8th, late afternoon, early evening, the jury in this matter returned a verdict finding Mr. Fahie guilty on all [counts] of the indictment.
>
> After the verdict was announced, the Government, I think it was you, Mr. Gerarde, asked that I poll the jury. I did so, and each juror answered, yes, this is my verdict. After the jury was discharged, Ms. Van Vliet pointed out for the record that she and Ms. Delgado had observed Juror number 11 -- number 11, Ms. Garcia, had hesitated before she answered.[6]

_____

[5] Immediately after the district court advised the parties the two jurors indicated "that was not their verdict[,]" defense counsel moved for a mistrial, which the court took under advisement (DE339:139).

[6] The trial transcript (DE339:132) reflects that immediately upon the jury's discharge, defense counsel put her observation on the record:

> MS. VAN VLIET: Judge, both Miss Delgado and I

I think the record will show that I acknowledged that fact. I had observed a hesitation, but I remarked that it was [consistent] with her deportment as I had observed it the two weeks we were here in trial.

Now I don't -- I don't think we discussed this at length. I think there was an observation, but I think it important now to catalog is one thing I don't think anyone disputes when Juror number 12, Mr. Bowen was asked, is this your verdict?

He did not hesitate and answered. Yes. So after, again, the jurors were discharged, Government lawyers were packing boxes, retrieving evidence, as was the defense.

We've discussed what time elapsed. Various periods have been given. I'm going to rely on record corroboration, but I think it was closer to a half an hour because I was ready to get in the elevator and leave.

It was brought to my attention by Mr. Santorufo [Deputy Clerk]. Jurors 11 and 12 had stayed behind. He, of course was going in and out of the jury room, getting materials for the Government and their certificates.

They had stayed behind and started a conversation with him about the verdict, suggesting it wasn't unanimous as to

_____

noticed that juror number -- I don't have my list handy -- but the young woman in the back row that is sitting in the middle whose first name is Sabrina.
    THE COURT: Garcia.
    MS. VAN VLIET: I should have known that; thank you. Number one, she hesitated when polled, looked at both of us and kind of just -- I don't know whether she was trying to say I am sorry or something -- she was not indicating – and she did it again as she was walking out of the box. I believe I needed to put that on the record.

31

all counts.

He [Mr. Santorufo] stopped that conversation. He found me as I was going to leave. And I found all of you and I think Ms. Van Vliet was almost to her car.

In any event, that's not really germane. We all reconvened. And after discussion with the parties brought the jurors in and I discharged them stating that we might be reaching out to the jury for further inquiry and investigation bringing us to today.

Does anyone have any dispute about how I've cited our record and the facts underlying the record?

MR. GERARDE: Judge, not from the Government as to that. I think it's also important to note that Juror 12 had left a voice mail for the defense.[7]

THE COURT: Okay.

MR. GERARDE: I'm not sure that's been made a part of the record yet.

THE COURT: Yes, you're right. That is a voice mail I have not reviewed, I've asked the parties to review and that'll bring us to the factors under 606.

But, yes, and it was that evening. And then the next day, Ms. Delgado picked up the phone thinking it was a law firm, realized who it was and essentially said, oh, I can't speak to you.

After summarizing the proceedings, the district court conducted a

brief inquiry with Juror 11 (Ms. Garcia), who was asked: "the verdict that

---

[7] The juror's attempt to contact defense counsel was summarized and made a part of the district court record (DE228:5-6, Ex. A).

was rendered on February 8th, was that your verdict?" Juror Garcia answered: "Yes. At the time that I answered that." (DE351:16). Once the court excused Juror Garcia, defense counsel noted her objection to the truncated interview (DE351:17). Juror 12 (Mr. Bowen) was not present, and absence that "perplexed" the court, who determined "I don't think we need to speak with [Juror Bowen] … He was like a lesser player in this – in this saga. He did not hesitate to answer yes. So I don't know that I am going to reconvene to hear from the elusive Mr. Bowen." (DE351:18).[8]

The significance of the jurors' express disagreement with the verdict, voiced almost immediately after being polled and then released, required considerably more investigation to determine if the verdict was indeed unanimous. Notably, two jurors came forward to challenge the verdict immediately after their release. One juror had visibly indicated her concern with the verdict while still in the courtroom, conduct commented on by both defense counsel and the district court. And when Juror 11 (Garcia) was later questioned, her response that the verdict was

---

[8] At a status hearing on February 12, 2024, defense counsel asked the district court to conduct an inquiry with at least both jurors who indicated "at a minimum that one of their verdicts as published was not their verdict." DE348:7-8).

hers "[a]t the time that I answered that[,]" was sufficiently ambiguous to warrant a further inquiry to identify whether her verdict was a mistake.

So, too, the circumstances justified a follow-up inquiry of Juror 12 (Bowen), despite his absence at the hearing. At a minimum, Juror 12's announced disagreement with the jury verdict required an inquiry akin to that the court conducted with Juror 11 (Garcia), in an effort to identify whether the verdict was unanimous.

While a district court's decision declining to interview jurors is subject to review for abuse of discretion, *United States v. Orisnord*, 483 F.3d 1169, 1179 (11th Cir. 2007), the circumstances here demonstrate that a comprehensive inquiry was needed to protect the Defendant's right to a unanimous jury verdict as required by *Ramos v. Louisiana*, 590 U.S. 83, 89-90 140 S. Ct. 1390, 1395 (2020) ("A jury must reach a unanimous verdict in order to convict."). "When a juror states that he has doubt, the trial judge should be alert to the probability that there may not be unanimity in the verdict." *United States v. Edwards*, 469 F.2d 1362, 1366-1367 (5th Cir. 1972) (juror responded, "It's my verdict, but I'm still in doubt.") (citing *United States v. McCoy*, 429 F.2d 739 (D.C. Cir. 1970) (juror responded, "Yes, with a question mark.")).

In this instance, Juror 11 (Garcia) indicated doubt about her verdict through conduct observed by defense counsel and the court. She then communicated her concerns to the court staff no more than thirty (30) minutes after leaving the courtroom. Juror 12, while not showing any hesitation about the verdict in the courtroom, nonetheless informed the court clerk that the verdict was not his. He took an additional step and reached out to counsel after his discharge to underscore his point.

The more comprehensive inquiry sought by defense counsel to resolve the evident indication of juror disagreement with the verdict is consistent with Rule 606(b) of the Federal Rules of Evidence. The Rule generally prohibits jurors from testifying about "any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." The district court's exercise of discretion in conducting a limited inquiry with Juror 11 comported with Rule 606(b) in that it did not intrude into the jury's deliberative process. But without a more encompassing inquiry, the district court was unable to identify whether exceptions to the Rule applied in the form of "extraneous information," "outside influence," or a

mistake with the verdict form.

The district court's initial decision to make an inquiry into the post-verdict allegations challenging juror unanimity recognizes that some form of Rule 606 inquiry was appropriate, but the process utilized by the court was incomplete and raised even more uncertainty. Unlike the disgruntled juror in *United States v. Daniels*, 803 F.3d 335 (7th Cir. 2015), whose post-verdict complaint of bullying was determined by the district court to not warrant any inquiry where the juror did not display discomfort with the verdict until after the jury was discharged and there was no indication of any outside influence, the district court here determined an inquiry was needed to assure jury unanimity. Yet, without inquiring of both jurors, and then following up with a determination whether the verdict was in fact theirs, the limited extent of the district court's exercise of discretion compromised the defendant's right to a unanimous verdict.

So, too, the decision in U*nited States v. Norwood*, 982 F.3d 1032 (7th Cir. 2020), declining to proceed with a post-verdict inquiry based solely on speculation of racial bias, is of limited assistance here when a juror's in-court conduct, coupled with two jurors' prompt expressions of

concern with the verdict, presented significant reason to investigate whether the verdict was unanimous. The district court's failure to conduct a fulsome hearing constitutes an abuse of judicial discretion, warranting a reversal with instructions to order a mistrial or conduct a comprehensive inquiry into the unanimity of the jury verdict.

## CONCLUSION

Andrew Fahie is entitled to a dismissal of his charges due to the egregious government misconduct and false testimony concerning the finding by a foreign tribunal that the confidential informant was unreliable. Because the entire prosecution depended on the informant's actions and recorded statements, this error caused substantial prejudice to the Defendant. Additionally, the evidence did not prove that the defendant conspired to import a substance containing a detectable amount of cocaine, requiring that the drug conspiracy conviction be vacated for insufficient evidence. Finally, the jury's failure to unanimously agree on its verdict requires the Court to declare a mistrial or remand the case with instructions for the district court to conduct an evidentiary hearing to determine whether the jury's verdict was unanimous.

37

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. This brief is printed in Century Schoolbook 14-point font and contains 7,235 words, as counted by Microsoft Word.

Respectfully submitted,

*S/ Benedict P. Kuehne*
**BENEDICT P. KUEHNE**
Florida Bar No. 233293
**KUEHNE DAVIS LAW, P.A.**
100 S.E. 2nd St., Suite 3650
Miami, FL 33131-2154
Tel: 305.789.5989
Fax: 305.789.5987
ben.kuehne@kuehnelaw.com
efiling@kuehnelaw.com

CERTIFICATE OF SERVICE

I certify on February 3, 2026, I electronically filed this document with the Clerk of the Court using CM/ECF. I also certify this document is being served this day on all counsel of record either via transmission of Notices of Electronic Filing generated by CM/ECF or in another authorized manner for those counsel or parties not authorized to receive electronical Notices of Electronic Filing.

By:    *S/ Benedict P. Kuehne*
       **BENEDICT P. KUEHNE**

39