IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

NO. **24-13063-JJ**

United States of America,

Appellee,

- versus -

Andrew Alturo Fahie,

Appellant.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

_____

BRIEF FOR THE UNITED STATES

Jason A. Reding Quiñones
United States Attorney
Attorney for Appellee
99 N.E. 4th Street
Miami, Florida 33132
(305) 961-9285

George E. Doty III
Chief, Appellate Division

Tatiana G. Pino
Assistant United States Attorney

Nicole D. Mariani
Assistant United States Attorney

Of Counsel

**Statement Regarding Oral Argument**

The United States of America respectfully suggests that the briefs and record before this Court adequately present the facts and legal arguments and that oral argument would not significantly aid the decisional process.

## Table of Contents

**Page:**

Certificate of Interested Persons ........................................................................c-1

Statement Regarding Oral Argument ....................................................................i

Table of Contents ................................................................................................ii

Table of Citations ..............................................................................................iv

Statement of Jurisdiction ....................................................................................x

Introduction ........................................................................................................1

Statement of the Issues........................................................................................1

Statement of the Case:

    1.    Course of Proceedings and Disposition in the Court Below ............2

    2.    Statement of the Facts ...................................................................12

    3.    Standards of Review ......................................................................17

Summary of the Argument ................................................................................18

**Table of Contents (continued)**

<u>**Page:**</u>

Argument:

I.      The District Court Did Not Err in Declining to Dismiss the Indictment
        for Outrageous Government Conduct After a DEA Agent Incorrectly
        Testified About When He Learned that a Mexican Judge Questioned
        the Credibility of a Non-Testifying Confidential Source in 2013.................19

II.     The Government Sufficiently Proved that Fahie Conspired to Import
        Cocaine Where, During Recorded Conversations, Fahie Agreed to
        Help the Sinaloa Cartel Move its Boats through BVI Waters
        Without Inspection in Exchange for 12 Percent of the Profits that
        the Cartel Made Selling the Cocaine Concealed on Those Boats in
        the United States ................................................................................. 26

III.    The District Court Did Not Abuse its Discretion in Denying Fahie's
        Mistrial Motion or in Not Further Investigating the Possibility that
        Two Jurors, After Being Discharged, Regretted Their Verdict. ...................35

Conclusion   ...................................................................................................41

Certificate of Compliance   ...........................................................................42

Certificate of Service   ...................................................................................42

## Table of Citations

**Cases:**                                                                                     **Page:**

*Chapman v. United States*,

   500 U.S. 453 (1991)...................................................................................... 31, 32

*Gavin v. Comm'r, Ala. Dep't of Corr.*,

   40 F.4th 1247 (11th Cir. 2022) ...........................................................................37

*Pena-Rodriguez v. Colorado*,

   580 U.S. 206 (2017)............................................................................ 36, 37, 40

*Ramos v. Louisiana*,

   590 U.S. 83 (2020) .............................................................................. 39, 40

*Tanner v. United States*,

   483 U.S. 107 (1987)...........................................................................................37

*United States v. Acosta*,

   963 F.2d 551 (2d Cir. 1992).............................................................................33

*United States v. Arbane,*

   446 F.3d 1223 (11th Cir. 2006)........................................................................27

*United States v. Brown*,

   934 F.3d 1278 (11th Cir. 2019)............................................................ 18, 37, 39

*United States v. Cannon,*

   987 F.3d 924 (11th Cir. 2021)............................................................. 22, 24, 26

**Table of Citations**

**(Continued)**

**Cases:**                                                                                                                   **Page:**

*United States v. Capers*,

  708 F.3d 1286 (11th Cir. 2013)..................................................................17

*United States v. Castaneda*,

  997 F.3d 1318 (11th Cir. 2021)........................................................ 17, 22

*United States v. Cuthel*,

  903 F.2d 1381 (11th Cir. 1990)..................................................................39

*United States v. Dawson*,

  64 F.4th 1227 (11th Cir. 2023) ..................................................................34

*United States v. Diaz*,

  248 F.3d 1065 (11th Cir. 2001)..................................................................28

*United States v. Dillard*,

  No. 22-11704, 2023 WL 28981 (11th Cir. Jan. 4, 2023)....................................25

*United States v. Ellisor*,

  522 F.3d 1255 (11th Cir. 2008)..................................................................28

*United States v. Flintroy*,

  No. 23-13519, 2025 WL 2779895 (11th Cir. Sept. 30, 2025)...........................25

## Table of Citations

## (Continued)

**Cases:**                                                                                      **Page:**

*United States v. Foster,*

  878 F.3d 1297 (11th Cir. 2018)......................................................................38

*United States v. Haimowitz,*

  725 F.2d 1561 (11th Cir. 1984)......................................................................24

*United States v. Hamilton,*

  168 F.4th 1354 (11th Cir. 2026) ....................................................... 18, 38, 39, 40

*United States v. Hurtado,*

  89 F.4th 881 (11th Cir. 2023) ..................................................................... 22, 23

*United States v. Jackson,*

  115 F.3d 843 (11th Cir. 1997)........................................................................32

*United States v. Jayyousi,*

  657 F.3d 1085 (11th Cir. 2011)................................................................... 22, 23

*United States v. Leahy,*

  152 F.4th 1356 (11th Cir. 2025) ....................................................................34

*United States v. McGhee,*

  553 F. App'x 895 (11th Cir. 2014) ................................................................25

**Table of Citations**

**(Continued)**

**Cases:**                                                                                                                          **Page:**

*United States v. Nunez*,

   1 F.4th 976 (11th Cir. 2021) .......................................................................27

*United States v. Ofshe*,

   817 F.2d 1508 (11th Cir. 1987)...............................................................25

*United States v. Palacios-Molina*,

   7 F.3d 49 (5th Cir. 1993)...........................................................................33

*United States v. Rodriguez*,

   218 F.3d 1243 (11th Cir. 2000)...............................................................28

*United States v. Rolande-Gabriel,*

   938 F.2d 1231 (11th Cir. 1991)...............................................................33

*United States v. Russell*,

   411 U.S. 423 (1973) ...................................................................................21

*United States v. Sanchez*,

   138 F.3d 1410 (11th Cir. 1998)...............................................................25

*United States v. Segura-Baltazar*,

   448 F.3d 1281 (11th Cir. 2006)...............................................................32

## Table of Citations

## (Continued)

**Cases:** **Page:**

*United States v. Siegelman*,

  640 F.3d 1159 (11th Cir. 2011)........................................................................35

*United States v. Stover*,

  329 F.3d 859 (D.C. Cir. 2002) .........................................................................39

*Warger v. Shauers*,

  574 U.S. 40 (2014) ...........................................................................................37

**<u>Statutes & Other Authorities:</u>**                                    **<u>Page:</u>**

18 U.S.C. § 1952 ................................................................................4

18 U.S.C. § 1956 .............................................................................3, 4

18 U.S.C. § 3231 ................................................................................x

21 U.S.C. § 841 ................................................................................31

21 U.S.C. § 960 ................................................................................27

21 U.S.C. § 963 ..................................................................................3

21 U.S.C. § 952 ......................................................................... 26, 27

28 U.S.C. § 1291 ................................................................................x

Fed. R. App. P. 32 ...........................................................................42

Fed. R. App. P. 4 ...............................................................................x

Fed. R. Evid. 606 ...................................................................... 35, 36

## Statement of Jurisdiction

This is an appeal from a final judgment of the United States District Court for the Southern District of Florida in a criminal case. The district court entered judgment against Andrew A. Fahie on August 8, 2024 (DE:290). The district court had jurisdiction to enter the judgment under 18 U.S.C. § 3231. Fahie filed a timely notice of appeal (DE:292; DE:296). *See* Fed. R. App. P.4(b). This Court has jurisdiction over this appeal under 28 U.S.C. § 1291.

**Introduction**

Andrew Fahie, while he was the Premier of the British Virgin Islands (BVI), agreed to accept millions of dollars in laundered bribes from a Drug Enforcement Agency confidential source pretending to represent the Sinaloa Cartel (the CS) to allow the cartel's cocaine-laden, United States-bound boats to travel through BVI waters without inspection. Fahie does not dispute that he made that agreement. Yet he attacks his drug and money laundering convictions on three grounds, arguing: (1) the court should have dismissed his indictment for outrageous government conduct because a witness incorrectly testified about when he learned that a foreign judge had questioned the CS's credibility; (2) the Government could not prove that his offense involved cocaine because the CS boasted that the cartel could conceal the cocaine so well that it would test negative; and (3) the court should have declared a mistrial after two jurors made post-discharge statements indicating regret. None of those arguments have merit. First, the outrageous government conduct defense applies only if there is an egregious act that precedes the criminal conduct, which quickly corrected erroneous trial testimony is not. Second, overwhelming evidence, including that he would receive 12 percent of the profits that the cartel made selling the cocaine, showed that Fahie knew the boats carried cocaine. And, third, Federal Rule of Evidence 606(b) prohibits courts from impeaching verdicts based on a juror's later regret. Thus, this Court should affirm Fahie's convictions.

**Statement of the Issues**

I.      Whether the district court abused its discretion when it declined to dismiss the indictment for outrageous government conduct after a law enforcement witness incorrectly testified about when he learned that a Mexican trial judge had said that the non-testifying confidential source may have made a false statement in an unrelated public corruption investigation in 2008.

II.     Whether the Government sufficiently proved that Fahie conspired to import cocaine where, on recorded conversations, Fahie agreed to ensure that BVI law enforcement did not inspect boats purportedly belonging to the Sinaloa Cartel traveling through BVI waters if the cartel paid him 12 percent of the profits that it made selling the cocaine that was concealed on those boats in the United States.

III.    Whether the district court abused its discretion when it followed Federal Rule of Evidence 606(b) and declined to declare a mistrial or conduct an extensive inquiry after two jurors indicated to the courtroom deputy, after the jury was discharged, that they might now regret their verdict.

**Statement of the Case**

**1.      <u>Course of Proceedings and Disposition in the Court Below</u>**

In May 2022, a Southern District of Florida grand jury indicted Fahie; Oleanvine Maynard, the Director of the Ports for the BVI; and Kadeem Maynard (Kadeem), Maynard's son, with drug and money laundering crimes arising out of

their plan, in exchange for large cash bribes, to use their government positions in the BVI to help the Sinaloa Cartel import thousands of kilograms of cocaine from Colombia to the United States (DE:21). The grand jury charged Fahie and the Maynards with conspiring to import cocaine into the United States, in violation of 21 U.S.C. § 963 (Count 1); conspiring to engage in money laundering, in violation of 18 U.S.C. § 1956(h) (Count 2); and attempted money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A) (Count 3) (*id.*).

On May 4, 2022, a magistrate judge held a detention hearing for Fahie (DE:322). During that hearing, the Government told the magistrate judge that Fahie agreed with a Drug Enforcement Agency (DEA) confidential source posing as a Sinaloa Cartel member (the CS) to facilitate the shipment of the cartel's cocaine from Colombia to the United States in exchange for bribes and a percentage of the drug sales (DE:322:17-20). A DEA agent testified about the CS's recorded conversations with Fahie (DE:322:21). When Fahie asked the DEA agent if it was the first time that the DEA worked with the CS, the DEA agent said that it was not and that the CS was reliable (DE:322:24). When Fahie asked the DEA agent, "[a]t any point in time were you familiar with any incident . . . where the information sourced to that [CS] has been questioned," the DEA agent said, "[n]o" (*id.*).

In October 2022, Fahie sent the Government a letter, saying that his investigator believed that he had identified the CS and asking the Government to

3

reveal the CS's identity (DE:82:3-4). Fahie added that his investigator said that, if he was right about the CS's identity, a Mexican trial judge had once said that the CS was unreliable (*id.*). The prosecutor responded, telling Fahie that it could not disclose the CS's identity because it would endanger him and that he did not possess any information about findings of unreliability made against the CS (DE:82:4). The prosecutor also told Fahie that the CS did not need to testify at trial because all his interactions with Fahie were recorded (DE:82:7). Fahie later sent the Government a copy of an April 15, 2013, Mexican trial court order that acquitted Mexico's former anti-drug czar of organized crime charges and that found that the statements all seven cooperating witnesses made in 2008, including that of the CS, may have been false, based on hearsay, or manipulated by the prosecutors (DE:197:3-4; DE:197 Ex. 1).

On November 8, 2022, a Southern District of Florida grand jury issued a Superseding Indictment against Fahie, reiterating the prior charges and adding a charge that Fahie violated 18 U.S.C. § 1952(a)(3) by engaging in interstate and foreign travel in aid of racketeering (Count 4) (DE:61).

In May 2023, both of Fahie's codefendants pleaded guilty, under plea agreements, to Count 1 (DE:100; DE:101; DE:102; DE:103).

On November 20, 2023, Fahie moved to dismiss his indictment, contending that the Government engaged in outrageous conduct when it failed to provide him with information related to the CS's credibility (DE:137). Fahie alleged that the

Government should have told the magistrate judge during his detention hearing that a Mexican judge questioned the CS's reliability in 2013 (*id.*).

On December 1, 2023, and January 12, 2024, the Government submitted two *ex parte* letters to the district court, explaining that the CS was involved in a Mexican anti-corruption investigation that ended in 2013 when a Mexican judge issued an order overturning the jury's verdict after finding multiple witnesses, including the CS, may have given false, coerced, or manipulated statements (DE:141-2; DE:203). The Government also explained that the DEA agent who testified at Fahie's detention hearing was not involved in the CS's participation in that Mexican anti-corruption investigation (*id.*). But the Government reported, after reviewing the DEA agent's old files, it found that a handwritten note indicating that, as part of his preparation for a sentencing in an unrelated case in 2018, the DEA agent learned about the 2013 Mexican judicial order (DE:203:4).

The Government also filed an opposition to Fahie's motion to dismiss the indictment (DE:143). The Government explained that the district court should not dismiss the indictment, because the allegations did not rise to the level of outrageous government conduct and because the information that the DEA agent omitted—a Mexican judge said that the CS and other cooperating witnesses may have made unreliable statements in Mexico in 2008—did not relate to Fahie's criminal conduct in the BVI in 2022 (*id.*).

5

On January 17, 2024, the district court held a hearing to determine when the DEA agent learned that about the 2013 Mexican judicial order (DE:346). At the outset, the district court noted that if the CS did not testify and the DEA agent only testified about giving the CS a recording device, it was "not sure how that matter that occurred in Mexico would ever be relevant" (DE:346:8). The district court, however, ruled that, if the DEA agent testified, Fahie could ask him about his misstatement during the detention hearing (DE:346:14-15). The district court elaborated, "[w]hile I don't think this rises to the level of misconduct that requires dismissal of the case, or anything of that nature, I do believe some limited questions about the comment in the bond hearing would be appropriate" (DE:346:15).

On January 29, 2024, Fahie's eight-day trial began (DE:332). The CS did not testify. The DEA agent testified briefly to authenticate the recordings taken by the CS; authenticate the transcripts made from those recordings; and testify about the seizure of Fahie's cell phones and laptop when he was arrested (DE:335:49-66).

On cross-examination, Fahie asked the DEA agent if he testified during Fahie's detention hearing that the CS was credible; the DEA agent confirmed that he did (DE:335:82-83). Fahie then asked the DEA agent when he learned about a Mexican judicial order questioning the CS's credibility (DE:335:82-83). The DEA agent did not directly answer the question, prompting the district court to excuse the jury and instruct the DEA agent to give a direct answer (DE:335:83-84). After the

6

jury returned, Fahie asked the DEA agent, "did you find out prior to May of 2022 that there had been a finding by a Foreign Judge that the CI in this case lacked credibility?" (DE:335:85). The DEA agent responded "no," and he added that he did not remember when he first learned about it (DE:335:85-86). The district court then intervened, questioning the DEA agent, and he testified that he knew about the Mexican judicial order before May 2022 (DE:335:87). When the prosecutor began redirect examination, he asked the DEA agent, "[w]hat was the approximate timeframe when you learned of the prior case where the CS was found to have lacked credibility" (DE:335:88). The DEA agent responded, "[a]pproximately 2018" (*id.*).

At the end of the Government's case, Fahie moved to dismiss the indictment for outrageous government conduct based on the DEA agent's incorrect testimony about when he learned about the Mexican judicial order (DE:338:101-05). Although Fahie conceded that the Government impeached the DEA agent, he contended the agent's conduct was so outrageous that the charges against him had to be dismissed (DE:338:105). The district court rejected that argument, explaining:

> Ultimately, while I don't think [the DEA agent] comported himself the way one expects a Federal law enforcement agent should in front of a jury, after I intervened . . . he ultimately acknowledged that he knew of the general information about the CI's credibility . . . .
>
> And, as you noted, yourself, [the prosecutor] got up and impeached or corrected his own witness

(DE:338:106-07).

The next day, the jury convicted Fahie on all four counts (DE:254; DE:339:128). After the district court published the jury's verdict, it individually polled each juror, and they all answered yes when asked if the pronounced verdict was their verdict (DE:339:130-31). After concluding the poll, the district court discharged the jury, and the jurors left the courtroom (DE:339:132).

After the jurors left the courtroom, Fahie said that he noticed that one of the jurors, before she answered "yes" during the jury poll, hesitated and looked at defense counsel (DE:339:132). The district court agreed that the juror "paused a minute," but the district court found that pause was consistent with that juror's behavior during trial, often either keeping her head down or looking around the courtroom (DE:339:133). The district court then concluded the trial proceedings (*id.*).

But, soon thereafter, the district court summoned the parties back to the courtroom (DE:339:133). The district court relayed that the courtroom deputy had reported that two jurors had remained behind after they were discharged and that "[t]hey suggested they would not have found Mr. Fahie guilty on all counts" (*id.*). The district court told the parties that it was considering advising the two jurors that it would open an investigation into their comments and that they were entitled to retain counsel (DE:339:134). The Government explained that, because the jurors had been discharged, the district court was not permitted to inquire into their now-

8

concluded deliberations (DE:339:136-37). The district court, however, called the two jurors into the courtroom and told them: "I have been advised by [the courtroom deputy] that you shared with him your disagreement with the verdict; which you neglected to share in open court. Because of that, I need to advise you that you will undoubtedly be contacted for further inquiry or investigation into this matter along with your fellow jurors. Until that time you are both discharged" (DE:339:139).

Fahie then moved for a mistrial, and the district court asked the parties to provide briefing (DE:339:139).

On February 12, 2024, the Government filed a brief explaining that Federal Rule of Evidence 606(b) prohibited the district court from revisiting the unanimous jury verdict returned against Fahie based on post-discharge statements of remorse by two jurors (DE:227). The Government relayed that there are only four exceptions to Rule 606(b)'s prohibition on jurors impeaching their verdict—a juror knew about extraneous prejudicial information, a juror suffered from outside influence, a juror made a mistake in completing the verdict form, or a juror was motivated by racial stereotypes or animus—and none of which were present here (*id.*).

On February 12, 2024, the district court held a hearing (DE:348). At the outset, the district court noted, "the record demonstrates that all 12 of the jurors answered yes" when asked if their verdict was guilty (DE:348:3). The district court also noted, "[t]here has been no suggestion of any inappropriate external pressure or

9

any inappropriate information being sent back to the jury room" (*id.*). The Government then explained that, under this Court's precedent, "no further inquiry is warranted of any of the jurors in this case," because none of the four Rule 606(b) exceptions applied (DE:348:3-6, 12-13). Before deciding whether to make further inquiry of the jury, however, the district court asked for more briefing (DE:348:16).

On February 13, 2024, Fahie filed a brief, arguing that the district court should interview the two jurors, informing the district court that one of those jurors called his counsel to ask about the district court's investigation into his comments (DE:228:13). Fahie alternatively requested, under Southern District of Florida Local Rule 11(e), permission to interview the jurors about their verdict (DE:231). The Government opposed both requests, again explaining that Rule 606(b) prohibited these two jurors from impeaching the jury verdict and explaining that Local Rule 11(e) could be invoked only if one of the four Rule 606(b) exceptions was present (DE:230; DE:233).

On February 20, 2024, the district court held another hearing (DE:349). The district court began by explaining that Rule 606(b) barred it from inquiring into the jury's deliberations unless that inquiry involved whether a juror was subject to extraneous prejudicial information, was subject to an improper outside influence, made a mistake in competing the verdict form, or relied on racial stereotypes or animus to convict the defendant (DE:349:2-3). The district court then said, "I am

unaware of any of those exceptions to Rule 606 being present in our case," instead finding "what we have are comments by jurors about the verdicts on all counts being their verdict" (DE:349:3-4). Thus, the district court continued, "we are in the very awkward position of not having the exceptions evident here or present here" (DE:349:4). The district court concluded the hearing without a ruling, saying that it wanted to continue its research (*id.*).

On March 7, 2024, the district court held another hearing (DE:252). The district court began by reiterating, "I believe that none of the four" Rule 606(b) exceptions were "evident in this case" (DE:252:8). But, the district court said, because it was concerned about the unanimity of the jury's verdict, it subpoenaed the two jurors who spoke with its courtroom deputy (DE:252:10). While one juror—the juror who had hesitated before answering the jury poll—came to the hearing, the other juror—the juror who called defense counsel for details as to how the district court could investigate him—did not (*id.*). The district court decided that, to ensure juror unanimity, she would briefly question the juror who came to the hearing (DE:252:12-14). When the district court questioned that juror, it said that she returned a guilty verdict and that the guilty verdict was her verdict "[a]t the time that [she] answered" the jury poll (DE:252:15-16). The district court then dismissed the juror and denied Fahie's motion for a mistrial, explaining that Rule 606(b) prohibited it from impeaching or further inquiring into the verdict since none of the exceptions

11

were present (DE:252:16-18). The district court added that it was not necessary to speak to the other juror, noting he "was like a lesser player" because "[h]e did not hesitate to answer yes" (DE:252:18).

On August 8, 2024, after a hearing, the district court sentenced Fahie to 135 months of imprisonment as to each of Counts 1 through 3 and 60 months of imprisonment as to Count 4, all to run concurrently (DE:290).

This timely appeal followed (DE:292; DE:296).

## 2.     Statement of the Facts

In March 2022, the DEA investigated the willingness of BVI government officials, including Fahie—who was the Premier—and Maynard—who was the Director of Ports—to accept bribes from drug cartels to help them import drugs into the United States (DE:333:11-12, 15-19, 29-38). As part of this investigation, a DEA confidential source posed as a member of the Sinaloa Cartel (the CS) (DE:333:11-12).

To begin the investigation, because they had mutual acquaintances, the CS contacted Kadeem, and told him that he wanted to "do some business" with his mother (DE:337:20, 41). On March 20, 2022, Kadeem and Maynard called the CS, and they agreed to meet that day (DE:337:41; Gov't Ex. 1b). That meeting, which the CS recorded, lasted about two hours (DE:336:43; DE:337:52; Gov't Ex. 2b).

Maynard and the CS initially discussed conversations that Maynard was

12

having with other drug traffickers, and then the CS presented her with his proposal (DE:337:43; Gov't Ex. 2b:23-33). He told Maynard that the Sinaloa Cartel wanted to bring boats carrying cocaine through BVI waters without inspection (DE:337:43, 47; Gov't Ex. 2b:23-26, 30-33, 51-59, 72-73, 96). The CS specified that the cartel's boats, which were coming from Colombia, needed to stay in BVI waters for 24 to 48 hours while they waited for an "open window" for safe passage into Puerto Rican waters (Gov't Ex. 2b:34). The CS told Maynard that the cartel needed to move cocaine from Colombia to the United States—particularly to Miami and New York—because those markets paid the highest prices (DE:337:47; Gov't Ex. 2b:51-53, 59, 72-73, 96). And the CS told Maynard that, while the boats were in BVI waters, the cocaine onboard would be concealed inside of five-gallon buckets of liquid construction material, boasting that this concealment would keep the buckets from "testing positive" if they were inspected (DE:337:43-44; Gov't Ex. 2b:31-32). The CS also said that he would pay the Maynards a percentage of "everything that we sell at the price of Miami or price in New York" (Gov't Ex. 2b:58-59, 87-88).

Maynard agreed to the plan, telling the CS that she could obtain shipping licenses for the cartel's boats so they could stay in BVI waters without inspection (Gov't Ex. 2b:35-37, 89-91). Kadeem added that he had "been doing this for years" and would make sure the cocaine passed undetected through BVI waters (Gov't Ex. 2b:69-70). Maynard then offered to enlist Fahie's help, telling the CS that Fahie

13

"will do this" and will do criminal things for "the right price" (DE:337:44, 47-48, 50; Gov't Ex. 2b:43-44, 71, 154-55, 159-61). When the CS asked to meet with Fahie, Maynard said she would arrange it (Gov't Ex. 2b:77-80, 93). At the end of that meeting, the CS gave Maynard $10,000 in cash and welcomed her and her son to the Sinaloa Cartel (DE:337:51; Gov't Ex. 2b:165-70).

Maynard then met with Fahie, relaying the CS's proposal (DE:336:52-54). Fahie agreed to meet with the CS, but he said he needed $500,000 in cash up front from the cartel (DE:337:55, 62). Maynard and Kadeem then called the CS; the CS recorded the call (DE:337:57-58; Gov't Ex. 3b). Maynard told the CS that Fahie was "quite interested," but that he would not meet with the CS until the CS confirmed that he would pay a $500,000 upfront cash bribe (DE:337:62; Gov't Ex. 3b:5-6, 15). The CS and Maynard agreed that she would arrange for the CS and Fahie to meet on April 7 (DE:337:64-65; Gov't Ex. 3b:36-37).

On April 7, 2022, Fahie, the Maynards, and the CS met; the CS recorded the meeting (DE:337:98-99; Gov't Ex. 7b). The CS told Fahie that he wanted to build a continuous alliance for "safe passage" for the cartel's cocaine through BVI waters (Gov't Ex. 7b:52-53). The CS explained that the cartel would manufacture the cocaine in Colombia and conceal it in buckets of liquid construction materials before placing it on boats bound for the United States (Gov't Ex. 7b:61). The CS claimed that the concealment was so good that, if law enforcement tested the liquid

14

construction materials, it would not test "positive" even though each bucket contained ten kilograms of cocaine (Gov't Ex. 7b:52-55). Indeed, the CS claimed to Fahie, it would take a chemist in Puerto Rico four days to extract the ten kilograms of cocaine from each bucket (*id.*).

The CS then told Fahie that the cartel wanted to send its boats through BVI waters while carrying "a lot of tons," and that the cocaine being transported on those boats would be sold in Miami and New York (Gov't Ex. 7b:57-60). The CS said that, for the first shipment, the cartel would send one boat carrying 3,000 kilograms of cocaine through BVI waters, and that, if that initial shipment went well, then the cartel would send two boats per month for the next four months (DE:337:99; Gov't Ex. 7b:57, 79).

The CS told Fahie that, in addition to the $500,000 upfront cash payment, the cartel would pay him a percentage of the profit that it made on the cocaine sold in the United States (Gov't Ex. 7b:69-72, 114, 124-25). Fahie calculated that, based on the CS's proposed 3,000 kilogram initial shipment, that trip alone would yield $78 million in cocaine profits (Gov't Ex. 7b:73). Fahie then agreed to the CS's proposal (Gov't Ex. 7b:76). To begin the arrangement, the CS and Fahie agreed that the CS would bring $700,000 in cash—$500,000 for Fahie and $200,000 for Maynard—to Miami on April 28, 2022, while Fahie was there for a conference so that Fahie could see it before the CS had it flown to the BVI on a private plane (DE:337:104-05;

15

Gov't Ex. 7b:136-40, 151-52, 161-66, 173-79, 206-07). Fahie and the CS decided that they would meet the night before—April 27, 2022—at a hotel in Miami for further discussions (Gov't Ex. 7b:156-60, 173, 206). The CS gave Fahie $20,000 in cash to seal their agreement (DE:337:103; Gov't Ex. 7b:115-17).

On April 27, 2022, Fahie and the CS met at a Miami hotel conference room, along with the CS's "godson," who was an undercover law enforcement agent posing as another cartel member; the CS recorded that meeting (DE:333:11, 15, 47; DE:338:36; Gov't Ex. 12b).

First, Fahie and the CS discussed that the initial test shipment would happen during the first week of July, and Fahie confirmed that Maynard would set up the necessary paperwork so that the cartel's boats would not be inspected (Gov't Ex. 12b:46-52). Fahie and CS also discussed how the cartel would make its 12 percent commission payments to him; Fahie insisted that the payment be made in cash brought to the BVI via private plane or boat (DE:334:6-10, 16-17; Gov't Ex. 12b:53-58, 61-72, 80-86, 108). The CS explained to Fahie that his first commission payment would be $6,268,200 (Gov't Ex. 12b:58). Next, the CS and Fahie discussed future shipments, with the CS reiterating that the cartel planned to send eight boats through BVI waters over the next four months (DE:334:10; Gov't Ex. 12b:59-60, 94-95). Fahie agreed (*id.*). The CS and Fahie also discussed that the cartel, after its first eight shipments, would then send some boats with low-quality cocaine through BVI

16

waters so that Fahie could intercept those boats, giving the appearance that he was working against, not for, the cartel (DE:334:10-11; Gov't Ex. 12b:96-99). Finally, the CS confirmed that he would give Fahie his initial $500,000 cash payment the next morning, explaining that it would be packed inside two boxes placed inside a suitcase stowed on a private plane that would fly the cash from Miami to the BVI (DE:334:15; Gov't Ex. 12b:104).

The next morning, the CS and the undercover agent picked up Fahie and drove him to the airport (DE:333:16; Gov't Ex. 13b). Once at the airport, the CS brought Fahie to the private plane purportedly flying his cash to the BVI (Gov't Ex. 13b:50-53). Fahie went inside of the plane, examined the boxes with bundles of cash inside, and asked the CS to confirm that it was both the $500,000 for him and the $200,000 for Maynard (DE:335:4-5; Gov't Ex. 13b:54). The CS confirmed it was the full amount, and Fahie walked off the plane (DE:335:5). Law enforcement then arrested Fahie (DE:335:5).

3.    **Standards of Review**

This Court reviews the denial of a motion to dismiss an indictment based on outrageous government conduct de novo. *United States v. Castaneda*, 997 F.3d 1318, 1325 (11th Cir. 2021). This Court reviews the sufficiency of the evidence de novo, considering the evidence in the light most favorable to the verdict and drawing all inferences and credibility choices in its favor. *United States v. Capers*, 708 F.3d

17

1286, 1296-97 (11th Cir. 2013). This Court reviews a district court's decision not to declare a mistral or hold an inquiry based on alleged juror misconduct for an abuse of discretion. *United States v. Hamilton*, 168 F.4th 1354, 1365 (11th Cir. 2026); *United States v. Brown*, 934 F.3d 1278, 1294 (11th Cir. 2019).

### Summary of the Argument

Fahie raises three meritless challenges to his drug and money laundering convictions.

First, Fahie argues the district court should have dismissed the charges against him for outrageous government conduct after a DEA agent gave incorrect trial testimony that both the district court and the prosecutor promptly corrected. Fahie is wrong for several reasons: (1) the outrageous government conduct defense has never been adopted by this Court; (2) the outrageous government conduct defense applies only to conduct that predates the defendant's criminal conduct, not alleged trial misconduct; and (3) the outrageous government conduct defense applies only to the most egregious acts, not to incorrect trial testimony about when an agent learned that, about ten years ago, a foreign judge questioned the credibility of a non-testifying confidential source.

Second, Fahie argues that his cocaine importation conspiracy conviction should be reversed, contending the Government did not sufficiently prove that he knew the substance being imported was cocaine. Fahie is wrong again. A reasonable

18

jury could have concluded that, even though the CS told Fahie that the cocaine would be so well concealed that it would not test positive, Fahie understood that thousands of kilograms of cocaine manufactured in Colombia were being transported on the cartel's boats. Indeed, Fahie and the CS, during recorded conversations, extensively discussed that Fahie would be paid 12 percent of the profit—including an initial payment of over $6 million—that the cartel would make selling the cocaine that was on those boats in New York and Miami.

And, third, Fahie argues that the district court should have declared a mistrial after its courtroom deputy relayed that two jurors, after they were discharged, made statements indicating that they regretted their verdict. Fahie is yet again wrong. Federal Rule of Evidence 606(b) prohibited the district court from inquiring into the jury's deliberations or allowing two jurors to impeach the verdict based on their later feelings of remorse.

Thus, this Court should affirm Fahie's convictions.

## Argument

I.   **The District Court Did Not Err in Declining to Dismiss the Indictment for Outrageous Government Conduct After a DEA Agent Incorrectly Testified About When He Learned that a Mexican Judge Questioned the Credibility of a Non-Testifying Confidential Source in 2013.**

Fahie argues that the district court should have dismissed his indictment for outrageous government conduct after a DEA agent incorrectly testified about when he learned that, in 2013, a Mexican judge issued an order saying that the CS—who

19

did not testify at Fahie's trial—may have made a false or manipulated statement in an unrelated public corruption investigation in 2008 (Br.:17-25). The district court did not err.

In April 2013, a Mexican trial judge issued an order overturning the organized crime conviction of a high-ranking Mexican government official, saying it was "questionable" whether the CS made a false or manipulated statement (DE:197-1). In 2018, while preparing for a sentencing in an unrelated case, the DEA agent made a handwritten note that indicated he learned about the Mexican judicial order then (DE:335:88). But, in May 2022, when he testified at Fahie's detention hearing, that DEA agent told the magistrate judge that he did not know of any questions regarding the CS's credibility (DE:322:24). About six months later, the prosecutor learned about the Mexican judicial order when Fahie's investigator discovered the CS's identity and told the prosecutor about the judicial order (DE:82; DE:197). After Fahie's investigator uncovered the Mexican judicial order, the DEA agent searched his files and found a 2018 handwritten note that referenced the judicial order, and the prosecutor then alerted the district court that the DEA agent knew about the order in 2018 (DE:141:2; DE:203).

However, when Fahie asked the DEA agent on cross-examination during trial if he learned about "allegations that a Foreign judge found the [CS] to lack credibility" before he testified before the magistrate judge in May 2022, the DEA

agent said "no" (DE:335:85). The district court immediately questioned the DEA agent, and he corrected himself, testifying that he knew that information before May 2022 (DE:335:87). On redirect, the Government reiterated that point, having the DEA agent again testify that he learned about the Mexican judicial order in 2018 (DE:335:88).

The DEA agent's quickly-corrected erroneous testimony on cross-examination about the credibility of a non-testifying confidential source is not outrageous government conduct requiring dismissal of Fahie's indictment for three independent reasons: (1) outrageous government conduct is not an adopted defense in this Circuit; (2) outrageous government conduct must occur before, not years after, the defendant's criminal conduct; and (3) outrageous government conduct requires egregious conduct far more shocking than quickly-corrected erroneous testimony about the credibility of someone who was not testifying at trial.

First, this Court has not adopted the outrageous government conduct defense. This purported defense, which is sometimes raised but never applied, "focuses on the tactics employed by law enforcement officials to obtain a conviction for conduct beyond the defendant's predisposition" and is derived from "the Supreme Court's recognition" in *United States v. Russell*, 411 U.S. 423 (1973), "of the possibility that law enforcement's tactics may be so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a

conviction." *United States v. Cannon*, 987 F.3d 924, 941 (11th Cir. 2021); *see also United States v. Hurtado*, 89 F.4th 881, 900 (11th Cir. 2023) (explaining outrageous government conduct is "only a potential defense in this Circuit, because neither the Supreme Court nor this Court has ever found it to actually apply and barred the prosecution of any case based on it"). As this Court aptly put it in *Castaneda*, "[l]ike the fabled creature Sasquatch, this defense has entered the common consciousness and is mentioned from time to time. Some claim to have caught fleeting glimpses of it in the remote backwoods of the law, but its actual existence has never been confirmed." 997 F.3d at 1324. Thus, Fahie is invoking a defense that does not exist. *See United States v. Jayyousi*, 657 F.3d 1085, 1111 (11th Cir. 2011) (pointing out "[s]everal of our sisters circuits have either rejected this defense completely . . . or have been sharply critical of the defense").

Second, even if the outrageous government conduct defense does exist, it would not apply here.

When this Court has discussed the concept of the outrageous government conduct defense, it has explained that "the actionable government misconduct must relate to the defendant's underlying or charged criminal acts," and thus it "occurs when law enforcement obtains a conviction for conduct beyond the defendant's predisposition by employing methods that fail to comport with due process guarantees." *Jayyousi*, 657 F.3d at 1111-12. "In other words, law enforcement would

22

need to somehow cause the defendant to engage in criminal conduct," meaning the outrageous government conduct must occur before the defendant commits his crime. *Hurtado*, 89 F.4th at 900. Indeed, in *Jayyousi*, this Court explained that outrageous government conduct could not arise out of alleged mistreatment that the defendant experienced when he was detained pre-indictment as an "enemy combatant" because his detention began after he committed his crime. 657 F.3d at 1112.

So too here. The outrageous conduct that Fahie alleges—the DEA agent's erroneous testimony during his criminal proceedings—did not occur before Fahie committed his crimes in March and April 2022. It occurred afterwards during Fahie's May 2022 detention hearing and 2024 trial.

In addition, even if the alleged misconduct occurred at an actionable time, whether the DEA agent accurately remembered when he learned that a Mexican judge said that the CS may have provided a false or manipulated statement would not have caused Fahie to engage in criminal conduct. Indeed, whether the CS was a credible witness had nothing to do with Fahie's crimes. All of Fahie's interactions with the CS were recorded—meaning the CS did not have to be relied upon to relay what Fahie said—and, during those recorded conversations, Fahie agreed to accept tens of millions of dollars to ensure that the Sinaloa Cartel could move boats carrying thousands of kilograms of cocaine through BVI waters without inspection. And because this was a sting operation, the CS was lying to Fahie about everything—the

23

money, the cartel's involvement, and the existence of the cocaine—so his credibility was of no importance. Instead, what was important was only that Fahie agreed to the CS's proposal to commit drug and money laundering crimes, no matter how fantastical parts of his plan were.

Third, even if the outrageous government conduct defense exists and even if the outrageous government conduct defense can be based on conduct that occurred after the defendant committed his crime, the defense still would not apply here because the DEA agent's erroneous testimony was not sufficiently outrageous.

To show outrageous government conduct, Fahie must demonstrate that the government's investigative techniques violated "fundamental fairness" to the point that they were "shocking to the universal sense of justice, mandated by the Due Process Clause of the Fifth Amendment." *Cannon*, 987 F.3d at 941. And, whether Government conduct is outrageous "turns upon the totality of the circumstances with no single factor controlling," and the defense "can only be invoked in the rarest and most outrageous circumstances." *United States v. Haimowitz*, 725 F.2d 1561, 1577 (11th Cir. 1984).

Consistent with those stringent principles, this Court has rejected the outrageous government conduct defense in every case to cross its path. For example, this Court held that outrageous government conduct did not occur where law enforcement supplied and sold illegal drugs to investigate and infiltrate a criminal

24

organization. *United States v. Sanchez*, 138 F.3d 1410, 1413 (11th Cir. 1998). Nor was it outrageous government conduct when the government placed a recording device on the defendant's attorney, even though this Court found that "conduct was reprehensible." *United States v. Ofshe*, 817 F.2d 1508, 1515 & n.6 (11th Cir. 1987). This Court held that it was not outrageous government conduct for the government to have a CS, who was a convicted felon, purchase firearms in violation federal law. *United States v. Dillard*, No. 22-11704, 2023 WL 28981, at *4-5 (11th Cir. Jan. 4, 2023). Indeed, it was not even outrageous government conduct when the government used a CS who had previously been terminated from being a CS after he lied, committed multiple crimes, and was committed for mental health treatment. *United States v. McGhee*, 553 F. App'x 895, 897-900 (11th Cir. 2014); *see also United States v. Flintroy*, No. 23-13519, 2025 WL 2779895, at * 2-4 (11th Cir. Sept. 30, 2025) (holding it was not outrageous government conduct where law enforcement used a CS with known credibility issues who was committing crimes).

Fahie has not surpassed the high, yet-to-be-met bar for outrageous government conduct. The misconduct that he alleges is that a DEA agent made an erroneous statement during his detention hearing and his trial about his knowledge of anyone who had questioned the non-testifying CS's credibility. And that erroneous statement—that the DEA agent did not know that a Mexican judge said the CS may have made a false statement in 2008 in an unrelated case—was quickly

25

corrected by both the district court and the prosecutor. That is not outrageous. Inaccurate but corrected testimony about the credibility of a non-testifying witness does not violate "fundamental fairness" to the point where it was "shocking to the universal sense of justice, mandated by the Due Process Clause of the Fifth Amendment." *Cannon*, 987 F.3d at 941. Indeed, neither this Court, nor any other court, has ever held that a district court should dismiss a defendant's indictment where a single witness testified erroneously about anything, let alone about when he learned of a decade-old statement potentially impugning the credibility of someone who was not testifying at trial.

Accordingly, for any or all the above three reasons, this Court should reject Fahie's outrageous government conduct defense and affirm his convictions.

## II. The Government Sufficiently Proved that Fahie Conspired to Import Cocaine Where, During Recorded Conversations, Fahie Agreed to Help the Sinaloa Cartel Move its Boats through BVI Waters Without Inspection in Exchange for 12 Percent of the Profits that the Cartel Made Selling the Cocaine Concealed on Those Boats in the United States.

Fahie raises a narrow challenge to the sufficiency of the evidence supporting his conviction for conspiring to import cocaine into the United States, in violation of 21 U.S.C. §§ 952(a), 960(b)(1)(B)(ii), and 963 (DE:61). He does not contest that he knowingly agreed, in exchange for an upfront $500,000 cash bribe and multi-million-dollar commission payments, to let United States-bound boats belonging to the Sinaloa Cartel that were loaded with buckets of liquid construction materials

26

concealing thousands of kilograms of cocaine travel through BVI waters without inspection. But, Fahie argues, as he did to the jury during closing, that, because the CS boasted that the cartel could conceal the cocaine so well that would it "not test positive," the Government did not sufficiently prove that the substance that he conspired to import was cocaine (Br.:25-29). Put differently, his argument is that well-concealed cocaine is not cocaine. As the jury found, that is unpersuasive.

To prove Fahie conspired to import a controlled substance under 21 U.S.C. §§ 952 and 963, the Government must prove beyond a reasonable doubt that there was "an agreement between two or more persons to import narcotics into the United States and that the defendant knowingly and voluntarily participated in that agreement." *United States v. Arbane,* 446 F.3d 1223, 1228 (11th Cir. 2006); *see also* 21 U.S.C. § 952(a) (criminalizing importing "into the United States from any place outside thereof any controlled substance"). Although the Government need only prove that the defendant knew he was importing a controlled substance, not necessarily that he knew which controlled substance it was, to convict under 21 U.S.C. § 952, *United States v. Nunez,* 1 F.4th 976, 990-91 (11th Cir. 2021), the penalty provision in 21 U.S.C. § 960, which imposes a ten-year mandatory minimum sentence for offenses involving more than five kilograms of cocaine, requires the Government to prove the defendant knew the substance was "a mixture or substance containing a detectable amount of . . . cocaine," 21 U.S.C. § 960(b)(1)(B)(ii). The

27

Government did just that.

Indeed, drawing all inferences in favor of the Government, a reasonable jury could find that the trial evidence proved that Fahie agreed to help the Sinaloa Cartel move cocaine from Colombia to the United States on boats traveling through BVI waters. *See United States v. Rodriguez*, 218 F.3d 1243, 1244 (11th Cir. 2000); *see also United States v. Ellisor*, 522 F.3d 1255, 1271 (11th Cir. 2008) ("It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt."). This is especially true because the testimony of a co-conspirator—here, Maynard—is sufficient to support a conviction so long as it is not, on its face, incredible or insubstantial. *United States v. Diaz*, 248 F.3d 1065, 1093-94 (11th Cir. 2001).

First, Maynard testified that, during her initial meeting with the CS, the CS told her that cocaine, which would be concealed inside of buckets of liquid construction materials, would be on the boats; that testimony was corroborated by the recordings of that meeting (DE:337:43, 47, 49; Gov't Ex. 2b:23-33, 51-59, 72-73, 96, 106-07). And, during that conversation, the CS told Maynard that the cartel would pay her a percentage of "everything that we sell at the price of Miami or price in New York" (Gov't Ex. 2b:58-59, 87-88).

28

Second, Maynard testified that she met with Fahie immediately after her meeting with the CS, telling him about the plan to accept payment from the Sinaloa Cartel to let its cocaine-filled boats pass through BVI waters without inspection (DE:337:52-55, 62). She said that Fahie agreed to meet with the CS if the CS paid him a $500,000 upfront cash bribe (DE:337:55, 62). And, on a recorded phone call, Maynard then told the CS that Fahie would meet with him about the deal if he paid a $500,000 upfront cash bribe (DE:337:62; Gov't Ex. 3b:5-6, 15). A text message between Fahie and Maynard, and a recorded phone call between Fahie and the CS, corroborated that Fahie agreed to meet with the CS on April 7, 2022 (DE:337:64-65, 84-85; Gov't Ex. 6b:12-23).

Third, on April 7, 2022, the CS recorded his meeting with Fahie, during which they repeatedly discussed that the boats would be transporting cocaine. Indeed, the CS explained to Fahie that the cartel would produce the cocaine in Colombia, conceal ten kilograms of cocaine in each five-gallon bucket of liquid of construction materials, load those buckets onto boats that would travel through BVI waters, offload those buckets in Puerto Rico, and use a chemist in Puerto Rico to extract the cocaine from the liquid construction materials and package it for sale in Miami and New York (Gov't Ex. 7b:52-61). The CS also told Fahie that the boats would be carrying "a lot of tons," which would be sold in the United States since that was where cocaine fetched the highest price (Gov't Ex. 7b:60).

29

Fourth, during that same April 7 recorded meeting, the CS and Fahie negotiated Fahie's payment for his role in the conspiracy. They agreed that the cartel would pay Fahie a percentage of the profit that it made selling the cocaine in the United States (Gov't Ex. 7b:69-72, 114, 124-25). Indeed, during that conversation, Fahie calculated that, based on CS's proposed initial shipment of 3,000 kilograms of cocaine, the first boat to pass through BVI waters would yield $78 million in cocaine-sale profits (Gov't Ex. 7b:73). They agreed that, for his participation in the conspiracy, Fahie would be paid a $500,000 upfront cash bribe and 12 percent of the profits that the cartel made selling the cocaine that was transported through BVI waters in the United States (DE:337:104-05; Gov't Ex. 7b:76, 136-40, 151-52, 161-66, 173-79. 206-07).

Fifth, on April 27, 2022, the CS recorded another meeting with Fahie, during which they again discussed that cocaine would be on the boats. Fahie and the CS confirmed that Fahie would be paid 12 percent of the profit the cartel made selling the cocaine that was on the boats in the United States (DE:334:6-10, 16-17; Gov't Ex. 12b:53-58, 61-72, 80-86, 108). The CS specified to Fahie that his commission on that first 3,000-kilogram cocaine shipment through BVI waters would be about $6 million (Gov't Ex. 12b:58). During that conversation, the CS and Fahie also discussed that the cartel, after its first eight shipments, would then send some boats with low-quality cocaine through BVI waters so that Fahie could intercept those

30

boats, giving the appearance that he was working against, not for, the cartel (DE:334:10-11; Gov't Ex. 12b:96-99).

Maynard's testimony that Fahie knew the boats were transporting cocaine and the recorded conversations repeatedly showing that Fahie and the CS discussed that the boats were carrying cocaine was more than enough to prove that Fahie knew he was conspiring to import cocaine into the United States. And the jury agreed. In closing, Fahie encouraged the jury to find that his offense did not involve cocaine because the CS boasted that the cartel could conceal it so well that it would "test negative," meaning the substance was just liquid construction materials, not cocaine (DE:339:43-46). But the jury reasonably rejected that view of the evidence, instead finding that Fahie understood that the substance that he agreed to import was cocaine. Indeed, Fahie's argument—an international drug cartel would deliver tens of millions of dollars in cash to a government leader via private plane and boat in less than four months in exchange for helping to transport a substance that was not cocaine—makes little sense.

Further, the legal underpinning of Fahie's argument—a controlled substance is not a controlled substance if it is well-concealed—is not supported by the Supreme Court case upon which Fahie relies, *Chapman v. United States*, 500 U.S. 453 (1991), or by the statutory text.

In *Chapman*, the Supreme Court analyzed 21 U.S.C. § 841(b), which in 1991

31

imposed a mandatory minimum five-year sentence on anyone who distributed any "mixture or substance containing a detectable amount" of LSD that weighed more than one gram. 500 U.S. at 455. The Supreme Court held that the weight of a cutting agent is included in the drug weight for sentencing purposes because it is part of a "mixture or substance containing a detectable amount" of a controlled substance. *Id.* at 459-60. The Supreme Court acknowledged that "[i]n some cases, the concentration of the drug in the mixture is very low," but it nevertheless determined that Congress intended for the entire mixture to be used for sentencing purposes. *Id* But the Supreme Court distinguished a "mixture" from a "container," such as a bottle or a car, from which a drug is separated before it is sold or consumed. *Id.* at 462-63. Containers, unlike mixtures, are not included in the drug weight for sentencing purposes. *Id.*

This Court has applied *Chapman* only in the sentencing context, using it to determine when packaging or delivery materials are included in a drug weight sentencing calculation. *See, e.g.*, *United States v. Segura-Baltazar*, 448 F.3d 1281, 1293 (11th Cir. 2006) (holding cutting agent included in the drug weight where it was sold with the drug); *United States v. Jackson*, 115 F.3d 843, 848 (11th Cir. 1997) (holding 1,004-gram block of sugar used to carry 10 grams of cocaine not included in drug weight because sugar would not be sold to or used by drug purchasers). No court has ever held that, because a controlled substance was concealed with non-

controlled substances, it lost its status as a controlled substance. Instead, in such cases, this Court considered the controlled substance separately from the non-controlled substance that concealed it in determining the drug weight for sentencing purposes.

For example, in *United States v. Rolande-Gabriel*, this Court held that "liquid waste" packed and transported with cocaine was not part of the drug weight used to calculate the defendant's sentence because the liquid was not consumable and had to be separated by a chemist for the drug to be consumed. 938 F.2d 1231, 1237-38 (11th Cir. 1991). *Rolande-Gabriel* did not hold the drug was not cocaine because it was so well-concealed inside of a liquid that it required a chemical extraction process to render it usable. *Id.*; *see also, e.g.*, *United States v. Palacios-Molina*, 7 F.3d 49, 53-54 (5th Cir. 1993) (holding weight of concealing liquid in which cocaine was dissolved for transport not included in drug weight, instead basing the sentence on the amount of cocaine extracted from the concealing liquid); *United States v. Acosta*, 963 F.2d 551 (2d Cir. 1992) (same).

And that understanding—a concealed controlled substance is still a controlled substance—makes sense. Neither § 841(b) nor § 960(b), which provide the sentencing penalties for violations of § 841 and § 952, respectively, define "detectable." And, where, as here, a statute does not define a term, "the plain meaning of the text controls unless the language is ambiguous or leads to absurd

33

results." *United States v. Dawson*, 64 F.4th 1227, 1236 (11th Cir. 2023). To decide the plain meaning of a statutory term, courts look to the dictionary definition of the term. *Id.* The dictionary definition of "detectable" is "capable of being detected." *Detectable*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/detectable (last visited May 6, 2026). And the dictionary definition of "detect" is "to discover or determine the existence, presence, or fact of." *Detect*, *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/detect (last visited June 9, 2026). Thus, as the courts have implicitly found, under the plain statutory text, so long as, through some means, the presence of a controlled substance can be discovered, the statutory requirements are met; there is no additional requirement that the controlled substance be easily detectable. That is the beginning and end of the analysis. *United States v. Leahy*, 152 F.4th 1356, 1373 (11th Cir. 2025) (explaining that the plain meaning of unambiguous statutory text based on the dictionary definitions of the terms is the beginning and end of statutory interpretation).

Accordingly, the *Chapman* line of cases has no relevance here. They do not hold that, if a controlled substance is so well concealed as to stymie ordinary drug tests, it is no longer a controlled substance. Instead, those cases delineate when, for sentencing purposes, that concealment mechanism should be included in the drug weight. Thus, this Court should affirm Fahie's cocaine importation conspiracy

conviction, because the Government sufficiently proved Fahie knowingly agreed to import more than five kilograms of cocaine into the United States.

### III. The District Court Did Not Abuse its Discretion in Denying Fahie's Mistrial Motion or in Not Further Investigating the Possibility that Two Jurors, After Being Discharged, Regretted Their Verdict.

After all the jurors found Fahie guilty, individually confirmed their guilty verdicts to the district court, and were discharged, the courtroom deputy reported to the district court that two jurors spoke to him in a way that "suggested they would not have found Mr. Fahie guilty on all counts" (DE:339:133). Fahie believes that, upon learning about that conversation, the district court should have declared a mistral or investigated both jurors. But, as the district court correctly found, Federal Rule of Evidence 606(b) prohibited it from doing either.

This Court has long recognized "a near-universal and firmly established common-law rule flatly prohibiting the use of juror testimony to impeach a verdict." *United States v. Siegelman*, 640 F.3d 1159, 1185 (11th Cir. 2011). Federal Rule of Evidence 606(b) codifies this long-standing "no-impeachment" rule:

> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

Fed. R. Evid. 606(b)(1). Thus, under that no-impeachment rule, usually, once a jury

renders its verdict, that verdict is final and neither the district court nor the parties can inquire into the jury's deliberations or overturn the verdict based on a juror's statements about her deliberations or verdict.

There are, however, four exceptions to Rule 606(b)'s no-impeachment rule. Rule 606(b) provides three of them: "A juror may testify about whether: (A) extraneous prejudicial information was improperly brought to the jury's attention; (B) an outside influence was improperly brought to bear on any juror; and (C) a mistake was made in entering the verdict on the verdict form." Fed. R. Evid. 606(b)(2). In 2017, the Supreme Court added the fourth exception, which applies when "a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant." *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 225 (2017). And those four exceptions are interpreted narrowly. In *Brown*, this Court explained:

> Outside these four exceptions, Rule 606(b) prohibits inquiry into a wide range of alleged misconduct. This prohibition includes whether a juror misunderstood or disregarded evidence, misunderstood or disregarded the judge's instructions, was confused about the legal significance of the jury's answers to special interrogatories or the consequences of the verdict, thought that the jury would be kept out indefinitely until agreement was reached, considered an election of the defendant not to take the stand, believed that recommending mercy would avoid the death penalty, was overcome by weariness or unsound arguments of other jurors, or by a desire to return home.

36

934 F.3d at 1302; *Gavin v. Comm'r, Ala. Dep't of Corr.*, 40 F.4th 1247, 1271-72 (11th Cir. 2022) (explaining, outside the four exceptions, "the Supreme Court has rejected attempts to circumvent the no-impeachment rule embodied in Federal Rule 606(b)"); *see also Warger v. Shauers*, 574 U.S. 40. 44-48 (2014) (holding Rule 606(b) prohibited evidence that a juror lied during voir dire); *Tanner v. United States*, 483 U.S. 107, 126-27 (1987) (holding Rule 606(b) prohibited inquiry into alleged juror intoxication).

Fahie does not allege that any of the four Rule 606(b) exceptions apply. Indeed, there is no indication whatsoever of extraneous prejudicial information, outside influence, mistake, or racial animus by either juror. Instead, what occurred was that two jurors, after they convicted Fahie and confirmed that their verdict was guilty on all counts when polled by the district court, later expressed potential feelings of regret about those verdicts (DE:339:128-33). And this Court has repeatedly held that a jury verdict cannot be impeached because a juror later feels regret about her verdict. *See Pena-Rodriguez*, 580 U.S. at 249 (Alito, J., dissenting) ("A juror who is initially in the minority but is ultimately persuaded by the other jurors may have second thoughts after the verdict is announced and may be angry with others on the panel who pressed for unanimity.").

For example, in *United States v. Hamilton*, this Court affirmed the district court's denial of a defendant's mistrial motion after a juror wrote on a post-verdict

37

questionnaire, "[i]t was never explained about a hung jury if we all didn't agree. I truly felt Mr. Hamilton wasn't guilty. I don't know the law that well. However, I wished I would've stuck to my guns and allowed another jury to try him." 168 F.4th 1354, 1365 (11th Cir. 2026). This Court explained that the district court did not need to inquire into that juror, because "Rule 606(b) bars any inquiry into the juror's mental process in reaching the verdict" and the defendant did not argue any of Rule 606(b)'s four exceptions applied. *Id.* at 1366.

Similarly, in *United States v. Foster*, this Court held that a district court did not abuse its discretion when it denied a defendant's mistrial motion after a juror sent the district court a letter saying that she was bullied into voting guilty and now regretted her decision. 878 F.3d 1297, 1303, 1310 (11th Cir. 2018). This Court explained, "we have no doubt that the juror's note in question concerns purely internal matters," and "[s]uch statements lie at the heart of evidence made inadmissible by Rule 606(b)" as they are about the "juror's mental processes concerning the verdict" and "describe[] nothing more than typical features of jury deliberations." *Id.*

And, in *United States v. Norwood*, the Seventh Circuit addressed a scenario similar to that here—a juror hesitated during the jury poll, called the district court the next day, and told the district court that she "didn't feel like the verdict that I said was right"—and affirmed the district court's denial of the defendant's mistrial

38

motion and decision not to inquiry further into the juror. 982 F.3d 1032, 1056-57 (7th Cir. 2020). The Seventh Circuit explained that, because none of the four Rule 606(b) exceptions were present, there was no need for further inquiry or a mistrial. *Id.* at 1057; *see also United States v. Stover*, 329 F.3d 859, 864-65 (D.C. Cir. 2002) (affirming district court's decision not to allow "redeliberations" after a juror expressed post-verdict misgivings).

Thus, the district court did not abuse its discretion in denying a mistrial or in not further inquiring into the two jurors about their conversation. While the district court did not speak to the second juror—he did not respond to the court's post-verdict subpoena—that does not matter. Indeed, "[n]o per se rule requires the trial court to investigate the internal workings of the jury whenever a defendant asserts juror misconduct." *United States v. Cuthel*, 903 F.2d 1381, 1382-83 (11th Cir. 1990). And where, as here, "the evidence presented to the district court failed to allege any impropriety that could possibly fall within an exception to the no-impeachment rule, the district court d[oes] not abuse its discretion in declining to hold a hearing or otherwise interview the juror." *Brown*, 934 F.3d at 1304.

Finally, to the extent Fahie is asking this Court to recognize a new fifth "non-unanimity" exception to Rule 606(b) based on the Supreme Court's decision in *Ramos v. Louisiana*, 590 U.S. 83 (2020) (Br.:34), this Court recently rejected that argument in *Hamilton*. 168 F.4th at 1366. This Court elaborated that such an

39

"additional exception" would "completely undermine the core purposes of the no-impeachment rule by allowing inquiry into the purely internal matters of the jury's deliberations and into the mental process of each juror. No verdict would ever be truly final." *Id.* at 1367. This Court also explained that *Ramos* has nothing to do with the no-impeachment rule. *Id.* Indeed, in *Ramos*, the Supreme Court held that Louisiana's and Oregon's practice of permitting 10-to-2 verdicts was unconstitutional, and it observed that it "has, repeatedly and over many years, recognized that the Sixth Amendment requires unanimity." 590 U.S. at 90-93. Thus, *Ramos* made it clear that unanimity has always been required, including in 1975 when Rule 606(b) was adopted. No court has ever suggested that Rule 606(b) conflicts with this long-standing federal requirement of juror unanimity. To the contrary, the Supreme Court explained that Rule 606(b) further that unanimity requirement by "providing jurors with considerable assurance that after being discharged they will not be summoned to recount their deliberations, and they will not otherwise be harassed or annoyed by litigants seeking to challenge the verdict." *Pena-Rodriguez*, 580 U.S. at 218.

Accordingly, Rule 606(b) forecloses Fahie's mistrial argument, and this Court should affirm his convictions.

40

**Conclusion**

For these reasons, this Court should affirm Fahie's convictions.

Respectfully submitted,

Jason A. Reding Quiñones
United States Attorney

By: */s/*Nicole D. Mariani
Nicole D. Mariani
Assistant United States Attorney
99 N.E. 4th Street
Miami, FL 33132
(305) 961-9285
nicole.mariani@usdoj.gov

George E. Doty III
Chief, Appellate Division

Tatiana G. Pino
Assistant United States Attorney

Of Counsel

41

## Certificate of Compliance

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,876 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements for Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016, 14-point Times New Roman font.

## Certificate of Service

I HEREBY CERTIFY that the foregoing Brief for the United States was filed using CM/ECF on this 16th day of June, 2026, and the foregoing brief was served via CM/ECF on Benedict P. Kuehne, Esq, counsel for Andrew Alturo Fahie.

By:    /s/Nicole D. Mariani
       Nicole D. Mariani
       Assistant United States Attorney

*jp*